## McBRIDE v. WESTERN UNION TELEGRAPH CO.

### No. 8158.

District Court, S. D. California, Central Division.

June 28, 1948.

Charles H. Carr, of Los Angeles, Cal., for plaintiff.

Lawler, Felix & Hall and Oscar Lawler, all of Los Angeles, Cal., for defendant.

J. F. T. O'CONNOR, District Judge.

The plaintiff, Edward J. McBride, doing business as Continental Press Service, with principal offices located in Cleveland, Ohio, and other offices located in Chicago, Illinois and New York, New York, is engaged in the business of disseminating information of sporting events, including racing news, over the interstate and foreign communication wires and facilities of defendant to its customers located throughout the United States, and in Canada and Mexico. The news of sporting events is transmitted to plaintiff's customers in interstate commerce by use of a Morse wire furnished by defendant.

Prior to April 2, 1948, plaintiff was supplied with Morse wire facilities used to transmit news to the plaintiff's customers. Plaintiff paid the defendant $500 per week for the service. The defendant, Western Union Telegraph Company, has furnished its wires for such service. On April 2, 1948 the defendant terminated and discontinued this service.

It is the contention of plaintiff that defendant is required by law to supply plaintiff with interstate Morse wire facilities. The complaint was filed April 22, 1948, together with affidavits supporting the allegations therein. The court, on the same day, issued an Order to Show Cause and also a temporary Restraining Order against the defendant, the plaintiff alleging that irreparable damage and injury would follow the continued refusal of defendant to supply the news service.

At the hearing on the Order to Show Cause, the defendant contended it was illegal to continue its wire service to the plaintiff, contending it was operating a public utility intrastate and interstate telegraph system, under the control and regulation, as to its intrastate operations, of the Public Utilities Commission of the State of California, and as to its interstate operations, of the Federal Communications Commission, and called the court's attention to several regulations under "Tariff F.C.C. No. 219". "Page 7 of said Tariff No. 219 has at all times mentioned in the complaint provided as follows: '(8) The service: Leased Facility service as covered in this tariff consists of furnishing for the private use of customers, facilities for transmitting electrical signals between specified points. The furnishing of Leased Facility service is subject to the availability of facilities and equipment after considering the requirements of the Telegraph Company's telegraph message service. Further, the rates and regulations provided in this tariff contemplates the furnishing of service only to points and locations where the Telegraph Company has facilities or can provide them at reasonable cost. All cases not meeting these requirements are subject to special consideration.

"'Facilities furnished under this tariff may be employed only for the private use of those companies whose offices are connected to the circuits, their affiliated and subsidiary companies and their representatives and each such office shall transmit and receive its particular communication over the equipment installed therein. Further, such facilities shall not be used either directly or indirectly for the handling of communications for the public or any person, firm or corporation other than those whose offices are connected to the circuits or their affiliated and subsidiary companies and their representatives. (Note: The restrictions set forth in this paragraph do not apply to facilities furnished to another communication common carrier.'

"The fifth revised page 8 (and the predecessor page 8) of said Tariff No. 219 has, at said times, provided and continues to provide as follows: 'Facilities furnished under this tariff shall not be used for any purpose or in any manner directly or indirectly in violation of any federal law or the laws of any of the states through which the circuits pass or the equipment is located, and the telegraph company reserves the right to discontinue the service to any drop or connection or to all drops and connections when it receives notice from federal or state law enforcing agencies that the service is being supplied contrary to law' ".

The defendant contends the facilities and service furnished plaintiff by defendant are known as leased facilities and also as private line service and circuits, under the exclusive control of plaintiff, for telegraphic communications between designated terminals in different states of the United States.

Defendant further advises the court that at all times mentioned in the complaint Tariff No. 219 prescribed by the Federal Communications Commission and Tariff Sheets Nos. 1399T and 1400T, prescribed by the California Public Utilities Commission, have contained and still contain the following identical language governing the public utility private line services and circuits furnished to plaintiff by defendant: "In view of the fact that the subscriber has exclusive control of his communications over the facilities furnished him by the Telegraph Company, and of the other uses for which facilities may be furnished him

by the Telegraph Company, and because of unavoidableness of errors incident to the services and to the use of such facilities of the Telegraph Company, the services and facilities furnished by the Telegraph Company are subject to the terms, conditions and limitations herein specified and to such particular terms, conditions and limitations as are set out in the schedules applicable to particular services and facilities."

The application made to defendant by plaintiff for this service contained the following language: "The undersigned agrees that the facilities furnished under this tariff shall not be used for any purpose or in any manner directly or indirectly in violation of any federal law or the laws of any of the states where the equipment is located, and that the company may discontinue the service to any drop or connection or to all drops and connections when it receives notice from federal or state law enforcing agencies that the service is being supplied contrary to law. This application shall become binding on both parties when accepted by the Company, such acceptance to be evidenced by the signature of one of its officers hereon or by the establishment of the service."

Defendant further alleges, that the Public Utilities Commission of the State of California, on its own motion, investigated the use being made of the communication facilities and instrumentalities, for the purpose of determining if such use, in any instance, was in violation of law or not in the public interest. Following these hearings, the defendant received a communication from the District Attorney of Kern County, California, the Sheriff of Kern County, California, and the Chief of Police, Bakersfield, California, notifying defendant that its telegraph instrument and wire (being part of the private line service and circuits leased by defendant to Continental Press Service) located at 1911 Edison Highway, Bakersfield, Kern County, California, had been and were on March 4, 1948 being used to violate section 337a and section 182 of the Penal Code of California, and requesting that defendant immediately discontinue said service and disconnect said telegraph instrument and wire at said address.

The defendant discontinued the use of said wire and telegraph instruments and the service has not been resumed. Also the Attorney General of the state notified the defendant, demanding that defendant immediately discontinue the leasing of its facilities and service to the plaintiff in California, contending that the service was being used to furnish information to bookmakers in violation of section 337a of the Penal Code of California. Counsel also called the court's attention to the Order made by the Public Utilities Commission of the State of California: " * * * and it must discontinue and disconnect service to a subscriber, whenever it has reasonable cause to believe that the use made or to be made of the service, or the furnishing of service to the premises of the applicant or subscriber, is prohibited under any law, ordinance, regulation, or other legal requirement, or is being or is to be used as an instrumentality, directly or indirectly, to violate or to aid and abet the violation of the law."

The plaintiff sets forth its activities in detail and states its position as follows:

"Consolidated is engaged in the business of disseminating sporting news, principally racing news, by means of daily and weekly publications which it prints in its own plant located at the above address. Consolidated prints and publishes the following daily racing news sheets commonly referred to as 'scratch sheets': Metropolitan Scratch Sheet, Reporter Scratch Sheet and Blue Sheet. A morning and an afternoon edition is printed each day except Sunday of the Metropolitan Scratch Sheet and Reporter Scratch Sheet. Its Blue Sheet is printed once daily except Sunday. Each week Consolidated sells approximately 100,000 daily scratch sheets. In addition, Consolidated publishes two weekly sporting papers, the Reporter Weekly and the Hollywood Observer, which are issued on Friday and have a circulation of 2,800 copies per week.

"Consolidated conducts its operations at the address above mentioned and at such place maintains both its offices and printing presses. The real estate is under lease and has an additional two years to run. The printing presses and other equipment owned

by Consolidated and used to conduct its business are presently valued at approximately $100,000.

"Consolidated publishes and distributes its scratch sheets six days a week, fifty-two weeks each year, Sundays being excepted. It has approximately sixty-five employees and maintains the usual business offices where its books and records are kept for the purpose of reflecting its social-security program, unemployment insurance, withholding taxes, State and Federal income taxes, city license taxes and various other data necessary to the usual conduct of a business."

"Consolidated's daily and weekly sports publications are sold throughout the State of California, and also in the State of Nevada. The Metropolitan Scratch Sheet is admitted to second-class mailing privileges. The scratch sheets are distributed in Los Angeles by means of route men in a manner similar to that employed by metropolitan newspapers."

"Consolidated received daily news, including racing news, from the Continental Press over the interstate Morse wire facilities of Western Union. Consolidated pays for this news approximately Five Hundred Dollars per week in accordance with its arrangement with Continental Press Service. This news is used in its daily and weekly publications. Prior to April 2, 1948, Consolidated had been receiving daily service from Continental Press Service over the Western Union interstate Morse wire facilities. On April 2, 1948, this news service was interrupted and discontinued and has not been since restored. Consolidated desires the restoration of this service and is ready, willing and able to continue to purchase news from the Continental Press Service."

The plaintiff further alleges:

"Continental Press receives news of all types, principally sporting and racing news from throughout the North American continent, which it transmits over interstate Morse wire facilities of Western Union to its office in Chicago, Illinois. From its Chicago office, the news is sent over interstate Morse wires of Western Union to customers throughout the United States, Canada and Mexico, among which are newspapers, radio stations, and daily racing publications usually referred to as scratch sheets. The news which the New York office receives from Chicago is relayed over separate interstate Morse wire facilities to eastern customers of Continental Press. When Continental Press has an application for service by a new customer or terminates a contract with an existing customer, it confers with Western Union and arranges for the extension or discontinuance of interstate Morse wire facilities to that particular customer. In each case where a customer is added, Western Union receives additional tariff for the use of the extended interstate wire facilities.

"The main interstate Morse wire facilities of Continental Press at the present time cross every state in the Union and extend into Canada and Mexico.

"Included among the subscribers of Continental Press who are served, directly or indirectly, in the various states, are Associated Press; United Press; Armstrong Publications; George Lawton, Publisher; Wahlmin Press Co. Inc., New York; Yonkers Daily Times, Yonkers, New York; Daily News and Trans-Radio Press, New York City; Illinois Sports News and Illinois News Association, Chicago, Illinois; Daily Sports News, Toronto, Ontario; Daily Sports News, Detroit, Michigan; Texas Daily Sports News, Houston, Texas; Howard Sports Daily, Baltimore, Maryland; Harvey A. Jr., Miami, Florida; Daily Sports News, Louisville, Kentucky; Times-Picayune, Daily Sports News, Daily State and Item Publishing Co., New Orleans, Louisiana; Columbus Journal and Columbus Dispatch, Columbus, Ohio; Old Pueblo Publishing Co., Tucson, Arizona; Sun Herald, Vancouver, Washington; and Victoria Times, Victoria, B. C. The following radio stations are also served: WTRY and WROW, Troy, New York; WINZ, Miami, Florida; WCAR and WLBK, Detroit, Michigan; WBNX, WFMO and WMCA, New York City; WLAP, Lexington, Kentucky; WITH, WCOM, WSID and WGIS, Baltimore, Maryland; WDAS, Philadelphia, Pennsyl-

vania; and WRIP, Providence, Rhode Island.

"General news and sporting news other than racing news, constitute from thirty to fifty per cent of the news furnished by Continental Press to its customers. Customers of Continental Press are free to distribute the news received from it in any manner or fashion they desire. Charges for such news service are based upon area, population, and other similar factors. Continental Press does not have any proprietorship or ownership interest in the business of its customers."

Plaintiff contends that such refusal to allow plaintiff to serve its customers will result in irreparable damage and injury by the permanent loss of the aforementioned Consolidated Publishing Company as a customer for its news, and that such continued refusal will result in irreparable loss of plaintiff's prestige and good will in the Los Angeles area.

It is true that if defendant is prevented from continuing its wire service to the plaintiff, the plaintiff's business will be destroyed. This is drastic action, particularly where the matter has not been fully presented in the trial of the action. The court, on May 24, 1948, made its Order vacating the temporary restraining Order and the Order directing restoration of service rendered by defendant to plaintiff, and denied the request for a preliminary injunction, and denied plaintiff's request for restoration of defendant's facilities and services to the plaintiff. Plaintiff filed in this court on June 4, 1948 a Motion for a Stay, pending appeal, and requested the court to fix bond. The statute gives the court this authority. 28 U.S.C.A. § 227, Judicial Code, § 129, amended. Federal Rules of Civil Procedure rules 62(d), 73(d), 28 U.S.C.A. following section 723c.

In all such cases the court must carefully scrutinize the facts as presented in the pleadings and affidavits to determine whether or not great harm or damage would result from either granting or denying the motion. The defendant would suffer no harm or damage if restrained from refusing to furnish the service heretofore set forth, but would, in fact, profit by continuing the service and would suffer financial loss if enjoined from furnishing the news service. On the other hand, if this court should be in error in restraining the defendant from furnishing the service alleged in the complaint, considerable damage would result to the plaintiff and the plaintiff would be without a remedy to recoup such damages. It is the purpose of courts to enforce and protect the rights of all parties in litigated matters.

The temporary Order of this court made April 22, 1948, is restored pending appeal of this action to the Circuit Court of Appeals, and pending decision of the Circuit Court of Appeals.

Bond will be fixed at $500.

The ruling of the court is amply sustained by authority.

Virginian Railway v. U. S., 272 U.S. 658, 669, 47 S.Ct. 222, 226, 71 L.Ed. 463. "An injunction which was in terms dissolved by the decree, or which expired by limitation, cannot be revived to take effect during the pendency of an appeal except by a new exercise of power by a court having the authority. Ordinarily such authority is vested in the lower federal court, as well as in this court. Under Equity Rule 74 (now F.R.C.P. 62(c) the judge who allows the appeal may, if he took part in the decision of the cause, make, at the time of such allowance, an order continuing an interlocutory injunction which would otherwise be vacated."

Louisville and Nashville R. Co. v. U. S., D.C., 227 F. 273, 274. "The inherent authority of a court of equity, in the exercise of a sound discretion, to accompany a decree changing the status quo, with an appropriate provision nevertheless preserving the status quo pending an appeal, is clear."

Toledo Newspaper Co. v. U. S., 6 Cir., 237 F. 986, 990. "On the final hearing or on appeal it might turn out that plaintiff was right; and a court may temporarily preserve the status quo, even after deciding to dismiss the cause."

Gulf Oil Corp. v. McManigal, D.C., 49 F.Supp. 75, 79. "Since the bill is to be dismissed, it follows as a matter of course

that the interlocutory injunction, heretofore awarded, should be dissolved. If the plaintiff desires to appeal from the court's action, I feel that the temporary injunction should be restored during the pendency of such appeal."