467 A.2d 1064

**GENERAL MOTORS CORPORATION**

**v.**

**MILLER BUICK, INC. et al.**

**No. 912, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Nov. 10, 1983.

Certiorari Denied April 2, 1984.

**376**

Francis B. Burch, Jr., Baltimore, with whom were Joseph G. Finnerty, Jr., Jean K. Shaffer and Piper & Marbury, Baltimore, on brief, for appellant.

Rex L. Sturm, Rockville, with whom were R. Edwin Brown and Brown & Sturm, Rockville, on brief, for appellees.

Argued before LISS, WILNER and BLOOM, JJ.

WILNER, Judge.

On August 11, 1983, the Circuit Court for Montgomery County declared appellant, General Motors Corporation (GM), to be in contempt of court by reason of its having

violated an interlocutory injunction issued by the court on July 8, 1982. The company was fined $1,000 a day, commencing August 5, 1983, for each day that the violation continued.

Aggrieved by the court's action, GM has brought this appeal, arguing that the contempt order was improper in that the injunction had previously expired by operation of law. In the circumstances of this case, we think that the argument is valid, and we shall therefore reverse.

## I.  *Background*

The underlying dispute arises out of the relationship and certain agreements between GM and one of its dealers, Miller Buick, Inc. (Miller). The relationship began in 1956, when Miller first became a Buick dealer. The latest franchise agreement was entered into on November 1, 1975.

On July 22, 1980, GM, apparently dissatisfied with Miller's facilities and sales performance, sent Miller a notice that the franchise agreement would not be renewed when it expired on October 31, 1980. Miller complained to the State Motor Vehicle Administration (MVA), arguing that the termination of its franchise was in violation of Md.Code Ann.Transp. art., § 15–209. That section provides, in relevant part, that, notwithstanding any term or provision in the franchise agreement, a manufacturer may not terminate a dealer's franchise unless the dealer has failed to comply substantially with the reasonable requirements of the franchise.

After a hearing, MVA concluded that Miller's failure to provide adequate facilities was excused by its inability to obtain necessary financing, and that GM was estopped from discontinuing the franchise. GM appealed to the Circuit Court for Montgomery County, which reversed. Miller then appealed that decision to this Court and obtained a stay of the circuit court judgment.

While the appeal was pending, the parties resolved their differences and, on December 23, 1981, entered into a settlement agreement. Miller acknowledged in the agreement that its current facilities were inadequate and that its "fail-

ure to provide new facilities as required by [GM] constitutes a failure to comply substantially with a reasonable requirement of the dealer agreement." It also acknowledged that the decision of the circuit court, reversing MVA, "is correct in all respects, is final, and is binding upon the parties", and it agreed to dismiss its appeal therefrom.

GM, for its part, agreed to continue the franchise relationship under the 1975 agreements, provided that Miller would promptly build new facilities. In particular, the extension was conditioned upon Miller (1) applying for construction financing and obtaining necessary construction permits by January 31, 1982; (2) commencing construction of new facilities by May 1, 1982, in accordance with plans approved by GM; and (3) completing construction and occupying the new facilities by July 1, 1983. The parties agreed that "the failure by Miller to perform any one of the [above enumerated obligations] shall cause the current arrangement to cease", and that "section 15–209 of the Transportation Article does not apply to this settlement agreement or the arrangement made hereby. . . ." The agreement was signed not only by GM and Miller, but also by the Administrator of MVA.

On May 18, 1982, GM sent Miller a letter calling attention to the settlement agreement and declaring that, as construction of the new facility had not commenced by May 1, 1982, the business relationship between the parties would terminate "effective with receipt of this notice to you."

Miller responded on June 7, 1982, with a four-count Declaration in the Circuit Court for Montgomery County against GM and a number of its officials. In Count I, Miller recited some of the above history, claimed that it had complied with its obligations under the settlement agreement, charged that GM's termination was therefore wrongful and constituted both a breach of the agreement and a violation of §§ 15–207 and 15–209 of the Transp. art., and asserted that the purported waiver of § 15–209 in the agreement was against public policy and therefore void. It asked, as relief, $10,000,-

000 in damages "and an immediate ex parte, interlocutory, and final injunction against [GM] enjoining it from terminating its franchise agreement with Plaintiffs."

Counts II, III, and IV incorporated by reference the allegations in Count I. Count II claimed that GM's action involved a coercive attempt to wrest the dealership away from Miller and was in violation of Transp. art., § 15–207;[1] Count III charged a violation of § 15–209; and Count IV, brought not against GM but against four of its officials, charged a conspiracy to cause GM to breach its agreements with Miller. Additional damages of $10,000,000 were sought in each of those three counts. Trial by jury was requested.

With the Declaration, Miller filed a separate motion for *ex parte* and interlocutory injunctive relief. The motion incorporated the allegations of the Declaration, averred that immediate, substantial, and irreparable harm would result if GM terminated the franchise, and asked that GM be enjoined from terminating the agreement "until such time as the merits of its right to do so can be tried and decided by this court." On June 16, 1982, the court issued an *ex parte* injunction; on July 8, 1982, it issued an interlocutory injunction.

The July 8 order recited the four factors to be examined in determining whether an interlocutory injunction ought to issue—the likelihood that the plaintiff will succeed on the merits, the balance of convenience, irreparable injury, and the public interest. The court found all four in favor of Miller, concluding, in particular, that "there is a likelihood that Petitioners will succeed on the merits of its case." The

---

1. Section 15–207 prohibits a manufacturer from coercing a dealer "to make any agreement with the manufacturer" or to order or accept delivery of any vehicle, parts, or equipment not required by law or the dealer's franchise or that was not voluntarily ordered by the dealer. Although the Declaration is not entirely clear in this regard, the thrust of Count II, we were told at oral argument, was to charge that the December, 1981, settlement agreement was coerced by GM, and that the alleged violation of § 15–207 had to do with that agreement.

order enjoined GM from terminating the 1975 franchise agreement with Miller "until such time as the issues joined have been fully and finally adjudicated...."

After a trial spread over ten days, the court directed a verdict in favor of defendants as to Counts III and IV, and submitted Counts I and II to the jury. During its deliberations, the jury sent out this question: "Can the settlement contract supersede the requirements of Section 15–209 of the Transportation Article of the Annotated Code of Maryland regardless of the nature, cause, or circumstances of Miller's failure to comply? If so, please explain why."

That issue was at the heart of Count III of the Declaration and had been resolved in GM's favor through the directed verdict entered on that count. The court, in response, therefore, told the jury not to concern itself with that issue. The jury then, on May 26, 1983, returned a defendant's verdict on Counts I and II. From the verdict sheet, it seems clear that the verdicts were based upon a finding of no liability, rather than a finding that damage had not been proven. Miller filed a timely motion for new trial, claiming a variety of errors, including the court's refusal to submit the case on specific issues. On June 21, 1983, GM moved the court for an order directing the clerk "to make an appropriate docket entry acknowledging that the interlocutory injunction entered in this case on July 7, 1982 was dissolved by the verdict of the jury and is of no further effect."

Both motions came before the court on August 1, 1983. The court denied the motion for new trial, and, as a result, the clerk entered final judgment in favor of the defendants. The court also denied GM's peculiar motion for a clarifying docket entry. It explained:

"All right. The issue before the Court on this Motion, of course, having looked at the order itself, the injunction is answered by Judge Mitchell. It was to continue until such time as the issues joined had been fully and finally adjudicated.

Now that, of course, is a pretty broad statement as to what is meant by fully and finally adjudicated. We have here a jury verdict in favor of the Defendant with respect to a claim for damages. The issues are not necessarily identical. The status, of course, may ultimately hinge on whether or not there was a violation of the contract. And if upheld or if finally adjudicated—and, again, I don't know whether that means by a Court at the trial level or subsequent to a finding on appeal.

I would think at least it would encompass the passage of thirty day[s'] time following which an appeal had not been entered, I think that would probably be a final adjudication, at least as to that issue.

In any event, the Court will have to consider at this time it seems the relative hardships that might be imposed on the parties in the event it terminates the injunction at this stage. I think it's obvious from the position of the parties that the Plaintiff would be so affected as to prevent his recovery or being placed back in this present status should he ultimately prevail.

I think that's the proper consideration in determining whether or not an injunction ought to be dissolved. In any case I do not believe that it is, at this time, right or for the—proper for the Court to terminate the injunction. Whether or not subsequent proceedings might have that result I can't say. But in any event the Court is not inclined to grant the Motion to enter such a docket entry. That Motion then is denied."

Notwithstanding the court's refusal to enter the clarifying docket entry, GM, on August 3, 1983, sent a letter to Miller advising it that the franchise agreement was terminated effective upon receipt of the letter.

■ Miller responded two days later with a motion to hold GM in contempt for violating the preliminary injunction entered on July 8, 1982. On August 11, 1983, after a hearing, the court found GM to be in contempt and assessed a fine of $1,000 for each day, beginning August 5, 1983, that

GM refused to do business with Miller.[2]  GM appealed the next day.

On August 31, 1983, in an obvious effort to purge itself of any contempt, GM, through counsel, wrote to counsel for Miller, pointing out that, notwithstanding GM's August 3 letter, the company did not, in fact, terminate its relationship with Miller.  Although maintaining that the contempt order was improper, GM advised that it would continue the business relationship until the final judgment of August 1 becomes enrolled or the contempt order is vacated.

## II.  *The Issues*

GM's position is a simple one.  It maintains that the interlocutory injunction, as a matter of law and by its own terms, lasted only "until such time as the issues joined have been fully and finally adjudicated", that the jury verdicts in its favor necessarily amounted to such a full and final adjudication, and that the injunction thus expired upon the rendition of those verdicts.  Miller, of course, disputes that; it also argues that, by effectively purging itself of contempt, GM has made the appeal moot.

▆ The mootness argument is absurd.  GM effectively remains under an injunctive order that it maintains is legally nonexistent.  Moreover, in light of the possible inconsistency between the court's oral remarks and the clerk's docket

---

2.  Unfortunately, there is no written order finding the contempt and assessing the fine.  Although in a case of constructive contempt, the Maryland Rules do not appear to require such an order, it would be better practice to have one.  Here, for example, there is some discrepancy between the transcript and the clerk's docket entry with respect to the fine and GM's ability to purge itself.  The transcript states: "The Court will impose a fine of $1,000 a day commencing August 5th and the Defendant may purge themselves [*sic*] of any *further* contempt by reinstating the franchise."  (Emphasis supplied.)  That would indicate an accrued fine, as of August 11, not subject to purging, of $7,000.  The docket entry states, "Imposes fine of $1,000.00 a day beginning August 5, 1983; Defendants may purge themselves of Contempt by Reinstating Franchise."  That would suggest that GM could avoid any fine, including that accruing between August 5 and August 11, by continuing its relationship with Miller.

entry, it is not altogether clear whether the company presently remains liable for part of the fine imposed. The appeal is not moot.

### III. *Viability of the Injunction*

In considering the viability of the interlocutory injunction, we look first to its terms. It restrained GM from severing its relationship with Miller "until such time as the issues joined have been fully and finally adjudicated."

The "issues joined" were those raised in Miller's Declaration; they were the only issues before the court. When were they "fully and finally adjudicated"?

■ Notwithstanding the court's musing to the contrary, it is evident that those issues were "fully" adjudicated when, on August 1, 1983, judgment absolute was entered on the verdicts previously rendered by the court and jury. The court, through its entry of directed verdicts on Counts III and IV, effectively rejected Miller's contention that GM's actions constituted a violation of § 15–209 and that GM's officials had been guilty of a civil conspiracy. Under the law, those verdicts could only have rested upon findings that the evidence was insufficient to sustain those two charges. The jury, by returning defendant's verdicts on Counts I and II, necessarily determined that the settlement agreement was valid and that the agreement had not been breached by GM. Those four verdicts, once extended to judgment, answered fully and completely every claim made by Miller against GM.

■ A "full adjudication", of course, is not necessarily a "final" one. A "final adjudication" can mean different things, and may occur at different times, depending upon the context in which the term is used. In many instances— perhaps most—an adjudication is not regarded as final until all appeals have been exhausted or the time for noting them has expired. *See, for example, People v. Brady,* 14 Ill. App.3d 830, 303 N.E.2d 528 (1973); *State v. Berube,* 139 Me. 11, 26 A.2d 654 (1942); and *cf. People v. McCloskey,* 2

Ill.App.3d 892, 274 N.E.2d 358 (1971); *compare,* however, *McGuire v. City of Cedar Rapids,* 189 N.W.2d 592 (Iowa 1971). In that sense, a "final adjudication" may not be synonymous with the term "final judgment", which often relates to appealability rather than unassailable conclusiveness.

■ It seems clear to us that the court's intention, as expressed in the injunction, was to extend the life of the injunction beyond the mere entry of an appealable judgment. Its aim, in using the term "finally adjudicated", as opposed, for example, to "decided on the merits", was to preserve the *status quo* between the parties, in the event of a judgment adverse to Miller, until all available appellate review had been either exhausted or abandoned. Otherwise, for Miller, an appeal would be a fruitless undertaking, as, even if it won, the franchise would have long vanished.

We therefore conclude that, *by its terms,* the interlocutory injunction did not necessarily expire upon the entry of judgment absolute on August 1, but was susceptible of continued vitality for at least thirty days thereafter in the event of an appeal. The complicating feature here is that Miller did not take an appeal from the August 1 judgments, and, on August 31, 1983, it lost its right to do so. As of August 1, however, when the court denied GM's motion to declare the injunction dissolved, and as of August 11, when it found GM in contempt, Miller's ability to challenge the verdicts on appeal was still extant; and, thus, *by its terms,* the injunctive order remained in effect.

This construction of the language of the injunction thus raises, and requires that we address, the more basic issue presented by GM; *i.e.,* whether, despite its terms, the injunction was dissolved by operation of law when judgment absolute was entered on August 1, 1983.[3]

---

3. Citing *Hughes Auto. Co. v. Polyglycoat Corp.,* 54 Md.App. 80, 456 A.2d 386 (1983), GM suggests that the injunction was dissolved when the jury verdicts were returned on May 26, 1983. Neither that case nor the law generally supports that proposition.

We start with the very definition of "interlocutory injunction". Md.Rule BB70 c defines such an injunction as one "granted after an adversary hearing on the propriety thereof, *but before a determination on the merits of the action.*" (Emphasis supplied.) This is to be distinguished from a "final injunction", which is defined in Rule BB70 d as one "final or permanent in its nature granted *after a determination of the merits of the action.*" (Emphasis supplied.)

■ It does not strike us as too simplistic to suggest that, if an interlocutory injunction cannot be "granted" after "a determination on the merits of the action", that being the office of a "final injunction", neither may it be continued after such a determination. That, indeed, is the general rule. An interlocutory injunction is issued in order to maintain the *status quo* until the court has either addressed and resolved the merits of the controversy or has otherwise determined that the claimant has no legal right to proceed. Upon the entry of a final appealable judgment on the merits or to that effect, it is regarded as being dissolved by operation of law. *See Keerl v. Keerl,* 28 Md. 157 (1868); *Musgrave v. Staylor, Admr.,* 36 Md. 123 (1872); *Wagoner v. Wagoner,* 77 Md. 189, 26 A. 284 (1893); *Diedel v. Diedel,* 133 Md. 286, 105 A. 271 (1918); *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 300 A.2d 367 (1973). As stated in *Musgrave, supra,* 36 Md. at 128, the purpose of such an injunction, in this context, is to prevent a disposition "which would defeat or embarrass the passage of a final decree under which the complainant's rights could be effectively secured and enforced. It served its whole office and purpose by being obeyed until final decree...." *See also Salisbury Beauty Schools v. St. Bd., supra,* 268 Md. at 67, 68, 300 A.2d 367; *Carlson v. Lawrence H. Oppenheim Co.,* 334 Mass. 462, 136 N.E.2d 205 (1956); *Epperson v. Kansas State Dept. of Inspections and Regulations,* 147 Kan. 762, 78 P.2d 850 (1938); *Nowell v. Nowell,* 157 Conn. 470, 254 A.2d 889, *cert. den.* 396 U.S. 844, 90 S.Ct. 68, 24 L.Ed.2d 94 (1969).

Miller correctly points out that these cases, and others to the same effect, involve equity proceedings, and argues that a different rule ought to apply where the interlocutory injunction is issued by a law court pending resolution of an action for damages. We see no validity to such a distinction. The issue is not one of law or equity, an action primarily for damages versus an action primarily for equitable relief, but only whether the final judgment effectively disposes of the issues that engendered and justified the injunction in the first instance. If it has, there is no longer any legal basis for continuing the interlocutory injunction. It is no longer interlocutory in nature.

■ Such a rule does not necessarily leave a litigant in Miller's shoes without the ability to take and effectively pursue an appeal. Although, unlike the Federal system, there is no specific rule in Maryland governing the situation, we think that the circuit courts do have the authority to preserve the *status quo* through the continuation of injunctive relief pending an appeal; but that must be done by the issuance of a new injunction. It is not just a matter of continuing in effect the interlocutory injunction.

Federal practice in this regard is instructive. It is governed by Fed.R.Civ.P. 62. Subsection (a) thereof generally precludes enforcement of a judgment for a period of ten days. Subsection (c) provides, in relevant part, that:

> "When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."[4]

---

4. Some States have adopted similar rules. *See, for example,* Mass. Civ.P.R. 62(c); *Cass Cty. Elec Co-Op., Inc. v. World Properties,* 253 N.W.2d 323 (N.D.1977); *Taylor Ditch Company, Inc. v. Carey,* 520 P.2d 218 (Wyo.1974); *Rivera v. Civil Service Comm'n of City & Cty. of Denver,* 34 Colo.App. 152, 529 P.2d 1347 (1974).

Although, technically, subsection (c) does not authorize an injunction pending the appeal until after an appeal has, in fact, been noted, by using that rule in conjunction with the court's authority to stay the enforcement of its judgment, Federal courts have continued injunctions in effect from the date of final judgment. *See, for example, Corpus Christi, Etc. v. Tex. Dept. of Human Resources,* 481 F.Supp. 1101 (S.D.Tex.), *aff'd* 621 F.2d 438 (1979); *Davila v. State of Tex.,* 489 F.Supp. 803 (S.D.Tex.1980); *DiMelia v. Bowles,* 57 F.Supp. 710 (D.Mass.1944), *aff'd* 148 F.2d 725, *cert. den.* 325 U.S. 886, 65 S.Ct. 1581, 89 L.Ed. 2000 (1945). Whether dating from the entry of final judgment, or the noting of an appeal, or some point in between, it is clear that this is a new injunction requiring an affirmative act on the court's part, and not merely the passive continuation of a previously issued interlocutory injunction. As stated in *Virginian Ry. Co. v. United States,* 272 U.S. 658, 668–69, 47 S.Ct. 222, 226, 71 L.Ed. 463 (1926):

> "It is settled that the force and effect of a decree of a federal court dismissing a bill and dissolving an interlocutory injunction is not suspended as a mere consequence of an appeal to this court, even if a supersedeas is allowed.... An injunction which was in terms dissolved by the decree, or which expired by limitation, cannot be revived to take effect during the pendency of an appeal except by a new exercise of power by a court having the authority."

*See also McBride v. Western Union Telegraph Co.,* 78 F.Supp. 446 (S.D.Cal.1948), and cases cited therein.

■ The considerations to be weighed in deciding whether to grant the continued injunctive relief are essentially the same as those which govern the granting of interlocutory relief; but, as with the question of any stay of judgment pending an appeal, they look to the situation then at hand. It is no longer a question, for example, of whether the applicant will prevail on the merits at trial, for he has already lost at that level. The question is whether it is likely that he will prevail on appeal. *See Long v. Robinson,*

432 F.2d 977, 979 (4th Cir.1970); *Fortune v. Molpus,* 431 F.2d 799, 804 (5th Cir.1970); *Pitcher v. Laird,* 415 F.2d 743, 744 (5th Cir.1969); *Reserve Mining Company v. United States,* 498 F.2d 1073, 1076 (8th Cir.1974); *Davila v. State of Tex., supra,* 489 F.Supp. 803, 810; *United States v. State of Mich.,* 505 F.Supp. 467, 470 (W.D.Mich.1980). Indeed, the would-be appellant must make a *"strong showing* that it is likely to prevail on the merits of its appeal" (emphasis supplied). *Va. Petro. Job. Ass'n v. Federal Power Com'n,* 259 F.2d 921 (D.C.Cir.1958); *Belcher v. Birmingham Trust National Bank,* 395 F.2d 685 (5th Cir.1968); *Miltenberger v. Chesapeake and Ohio Ry. Co.,* 450 F.2d 971 (4th Cir.1971); *Adams v. Walker,* 488 F.2d 1064 (7th Cir.1973). That, of course, is tantamount, in most cases, to proving the likelihood that the trial judge committed some reversible error.

Maryland, as we have observed, does not have an exact counterpart to Fed.R.Civ.P. 62(c); however, that rule is generally regarded as being but one manifestation of the inherent and "long established right of the trial court, after an appeal, to make orders appropriate to preserve the *status quo* while the case is pending in the appellate court." *United States v. El-O-Pathic Pharmacy,* 192 F.2d 62, 79 (9th Cir.1951); *Ideal Toy Corporation v. Sayco Doll Corporation,* 302 F.2d 623, 625 (2d Cir.1962); *Pettway v. American Cast Iron Pipe Company,* 411 F.2d 998 (5th Cir.1969); *Shinholt v. Angle,* 90 F.2d 297 (5th Cir.1937); *Merrimack River Sav. Bank v. Clay Center,* 219 U.S. 527, 31 S.Ct. 295, 55 L.Ed. 320 (1910); *but see Cumberland Tel. & Tel. Co. v. Louisiana Public Service Comm'n,* 260 U.S. 212, 43 S.Ct. 75, 67 L.Ed. 217 (1922).

■ That general power has also been recognized as inherent in the circuit courts in Maryland. In *Bullock v. Director,* 231 Md. 629, 633, 190 A.2d 789 (1963), and again in *Lang v. Catterton,* 267 Md. 268, 282, 297 A.2d 735 (1972), the Court of Appeals observed that the noting of an appeal "does not necessarily stay all further proceedings in the trial court" or "strip said court of all power over the proceeding in which

the appeal has been taken...." In particular, the Court held that the trial court may "make such orders and decrees as may be necessary for the protection and preservation of the subject matter of the appeal; and it may do anything that may be necessary for the presentation of the case in this Court, or in furtherance of the appeal." [5] *See also Eisenbeiss v. Jarrell,* 52 Md.App. 677, 451 A.2d 940 (1982), *cert. den.* 295 Md. 301 (1983); Md.Rules BB77 and BF40.

We think that, under this inherent authority, had Miller indicated to the court an intention to appeal, and had it, in fact, noted and pursued a timely appeal, the court would have had the power to issue a post-trial injunction continuing in effect the restraining order against GM. In order to do that, however, the court would have had to weigh the four relevant factors for the granting of an injunction as of that point in time, and to conclude that Miller would be likely to prevail in its appeal. That, of course, was not done. Not only does the record fail to disclose any announced intention on Miller's part to proceed with an appeal, but the court, having just denied Miller's motion for new trial, gave no indication that it considered Miller's arguments likely to win approval on appeal.

■ In summary, we believe that, notwithstanding its language indicating an intent to survive longer, the interlocutory injunction expired, by operation of law, when judgment absolute was entered on August 1, 1983, and that, although the court had the *power* to reinstate or renew the restraining order pending an appeal, the conditions under which it might properly have done so have not been shown to be present in this case. It follows, then, that from and after August 1, 1983, there was no valid restraining order in effect against GM, and that the finding of contempt and the fine imposed thereon must be vacated.

---

**5.** Certain aspects of *Bullock v. Director* were overruled in *Pulley v. State,* 287 Md. 406, 416, 412 A.2d 1244 (n. 2) (1980); however, the point for which the case is cited above was, if anything, reinforced in *Pulley.*

ORDER OF CONTEMPT VACATED; APPELLEES TO PAY THE COSTS.