OLIVER ERSKINE ET AL., APPELLANTS, v. THE BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, TRUSTEE, ET AL., APPELLEES.

104 N. W. 2d 285

Filed July 1, 1960. No. 34672.

*Frederick J. Patz* and *Ralph H. Gillan,* for appellants.

*Cline, Williams, Wright & Johnson, Sam C. Zimmerman,* and *Robert E. Johnson, Jr.,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is a suit against the Board of Regents of the University of Nebraska to recover possession of 320 acres of land which had been devised to such board by the will of Cora E. Rogers, deceased, subject to specified conditions. Plaintiffs are named devisees of the real estate in the event of the failure of the Board of Regents to comply with the conditions attached to the devise. Plaintiffs alleged a failure of compliance on the part of the Board of Regents and asserted title to the lands as contingent devisees. The trial court found that the Board of Regents had complied with the terms of the will of Cora E. Rogers, deceased, and dismissed the petition at plaintiffs' costs. The plaintiffs have appealed.

The evidence shows that Cora E. Rogers died on June 29, 1945, leaving a will by which the lands involved herein were devised to the Board of Regents for use as an experimental farm for the promotion of agriculture and for the benefit of students attending the College of Agriculture of the University of Nebraska. The portion of the will involved in this litigation provides: "Said agricultural lands shall be known as the 'Rogers Memorial Farm', a memorial to both my son and husband, and shall be enclosed with a fence of suitable permanent construction, using concrete posts with a gateway, or gateways, suitably marked with said name; said lands

shall be operated by said Trustees as an experimental farm for the promotion of agriculture and the benefit of students attending the College of Agriculture of the University of Nebraska. The Board of Regents of the University of Nebraska shall provide, out of the income from said property, two scholarships in the College of Agriculture of not less than Five Hundred Dollars ($500.-00) annually. Said Trustees shall have no power or authority or right to ever sell or mortgage said farm, or contract any debt, or debts, of any kind or nature whatsoever, which shall ever for any reason whatsoever divert said trust from the purpose herein determined, and the property herein set aside for said trust shall never be subject to any mortgage, mechanics' lien or other encumbrance, lien or devise of any nature whatsoever. Said Trustees shall keep the farm in good state of cultivation.

"In the event of any attempted sale, lease or mortgage of said property, or failure to carry out any of the above requests, or in the event The Board of Regents of the University of Nebraska do not accept said gift within six (6) months from and after my death, said farm shall go to the following named persons, to be divided share and share alike: * * *."

Plaintiffs contend that the Board of Regents failed to erect a gateway with suitable markings in accordance with the terms of the will. The evidence shows that identical pylons were erected on each side of the entrance to the farm. Each pylon was approximately 8 feet wide, 3 feet thick, and 6 feet high, with Indiana limestone bases and capstones. The pylons were faced on all four sides with cherry red face brick. A white marble plaque was placed on the face of each pylon, each of which was approximately 26 inches by 16 inches. The plaque on the left pylon was inscribed "ROGERS MEMORIAL FARM UNIVERSITY OF NEBRASKA." The plaque on the right pylon was inscribed "GIVEN BY CORA E. ROGERS IN MEMORY OF EDGAR A.

ROGERS HUSBAND EDWARD ALFRED ROGERS SON." The gateway was landscaped with trees and shrubs. The structures clearly are in accordance with the terms of the will. The contention that noncompliance was established because a swinging gate was not installed or fences built up to the pylons is without merit. The purpose of the gateway was to indicate to the public the gift of the farm as a memorial to the husband and son of the deceased. The structures fully accomplished the purpose of the deceased as disclosed by the provisions of her will.

The plaintiffs assert that the Board of Regents failed to enclose the farm with a fence of suitable permanent construction and use concrete posts, as prescribed by the will. The evidence shows that the land was fenced and concrete posts used. The fence has been maintained with concrete posts except for one 330-foot section on the east side of the land. This section of the fence was in the area where surface waters drained from the land and is subject to flooding after heavy rainfall. Concrete posts were found to be impractical and steel posts were used as replacements in this section of the fence. While the use of steel posts in this section of the fence was not literally in compliance with the provision of the will it is a substantial compliance under the existing conditions and is insufficient to require a forfeiture of the devise to the Board of Regents. We find the evidence concerning the construction of the fence to be insufficient to sustain a forfeiture of the devise to the Board of Regents for a breach of the condition contained in the will.

Plaintiffs assert a violation of the condition in the will that two scholarships in the College of Agriculture of not less than $500 shall be provided annually. Whether or not this provision means two scholarships totalling $500 annually, or two scholarships of $500 each, is not clear. In any event, a forfeiture will not ordinarily be declared where the trustee in good faith adopts one of

two interpretations equally reasonable. The evidence shows that scholarships were not granted the first 2 years after the Board of Regents took possession of the land, the income from the farm being used to meet other conditions of the will. In 1948 two scholarships of $250 each were granted, although one-half of one scholarship was not paid because of the graduation of the grantee at mid-year. No scholarships were granted in 1949. In 1950 two scholarships of $250 each were granted. In 1951 and each year thereafter two scholarships of $500 each have been granted. While the records show that in the early years of the trust there were no scholarships granted, or were granted in an amount less than $500, two scholarships of $500 each have been granted since 1951. After reviewing all the evidence dealing with the facts and circumstances, and the lapse of almost 10 years since the claimed breaches of condition, we conclude that the evidence will not sustain a forfeiture. The evidence shows that expenses exceeded income during the period from 1946 to 1957. While it is true that such expenses include many items of capital investment, we cannot say that the Board of Regents intentionally or willfully violated the scholarship provision of the will. There has been a substantial compliance with this condition of the will and actual compliance for the last 10 years. Under such a situation a forfeiture will not be declared.

The evidence shows that the scholarships were limited to senior men in the College of Agriculture for several years and then made available to men students in their senior and junior years. Plaintiffs contend this to be a violation of the will. We point out that the will does not specify the class of students eligible to receive these scholarships. It was clearly left to the discretion of the Board of Regents to make this determination. The evidence shows that the granting of these scholarships was integrated into other scholarship programs. It shows, also, that the Board of Regents deemed it advis-

able to limit the scholarships to students who had already made good records in the College of Agriculture and who were more certain to complete the course and make contributions to the scientific development of agriculture in the state. We find that the limiting of scholarships to senior and junior men students is based on reasonable considerations and clearly within the terms of the will.

The primary contention advanced by the plaintiffs is that the Board of Regents has not used the farm as an experimental farm for the promotion of agriculture, or used it for the benefit of students attending the College of Agriculture, or kept the farm in a good state of cultivation, all as required by the terms of the will. The record is replete with evidence on these subjects, expert and otherwise. We shall limit our discussion to a general consideration of the evidence and the findings to be made therefrom.

Prior to the time the Board of Regents took possession of the farm under the terms of the devise it was used for the growing of corn, wheat, oats, and what is usually termed row crops. The Board of Regents discovered that the land, which was rolling in character, was subject to erosion by surface waters. It was determined that there had been a loss of top soil in excess of 25 percent on a substantial portion of the land and that the top soil was progressively being depleted. The Board of Regents, acting through the College of Agriculture, thereupon requested the services of the United States Department of Agriculture Soil Conservation Service in developing a comprehensive conservation program. The topography of the land was examined, the extent of the erosion determined, and the degree of the depletion of the top soil carefully estimated. From this a plan of conservation was formulated. In March 1946 a contract was entered into with the Lancaster Soil Conservation Service for the carrying out of the plan of conservation agreed upon. This included a terracing of the slopes, the elimination of gullies and drainage ditches

not required, the grassing of remaining waterways, and the planting of grasses to build up the soil and resist further depletion by erosion.

Pursuant to the plan agreed upon and the advice of technicians in farm-land conservation and soil structure and fertility, a program of terracing was carried out. The number of gullies was thereby decreased from 11 to 3. The remaining 3 were grassed to prevent washing. The lands with top-soil loss were planted to brome grass and alfalfa. In 1948 the planting of brome grass and alfalfa was commenced and its planting progressively increased to 178 acres. From 1952 to 1955 the number of acres of brome grass and alfalfa remained at this amount. Subsequent to 1955 a system of crop rotation was commenced which reduced the acreage of brome grass and alfalfa and increased the acreage in annual crops. In 1958 the amount of brome grass and alfalfa was 109 acres and the amount of annual crops was 156 acres. The record is replete with evidence that the planting of brome grass and alfalfa to eliminate the erosion of the land and to build up the top soil was a proper conservation practice necessary to be followed if the farm was to reach its potential productivity.

The necessity for the planting of brome grass and alfalfa having been determined as the proper means for building up the soil resources and productiveness of the farm, the Board of Regents concluded that the farm should be used as an experiment farm for a beef cattle breeding research program. The considerations for this conclusion were the importance of the beef cattle industry in this state, the need of facilities for beef cattle breeding research, and the necessity for keeping a large portion of the farm in grass. With this end in view the farm was stocked with beef cattle and the farm devoted mainly to beef cattle breeding research.

The plaintiffs do not deny that the farm is being used as an experimental farm for beef cattle breeding research. They do contend that the farm has not been

kept in a good state of cultivation in accordance with the condition attached to the devise. There is little dispute in the facts, the issue hinging largely on the meaning of the term "good state of cultivation," as used in the will. The issue in turn resolves itself into the question as to whether or not the seeding of land to brome grass and alfalfa is in keeping with the requirement that the farm be kept in a good state of cultivation.

It is our conclusion that a good state of cultivation as used in the will is synonymous with good husbandry. It includes good management and care, and usually, but not always, implies the planting of annual crops. The terracing of lands, the preparation of seed beds, the application of fertilizers, and the harvesting of crops, whether annual crops or perennial grasses such as brome grass and alfalfa, is a cultivation of the land within the meaning of a "good state of cultivation" as used in the will. The plaintiffs assert that to cultivate land means to stir or turn the soil annually and that the planting of non-native grasses is violative of the condition. The evidence indicates that the word cultivation does have such a colloquial usage. But the meaning of cultivation as shown by its dictionary definition and its ordinary use in the field of science in agriculture indicates a much broader meaning. It connotes a directed use of land as contrasted to its use in its natural state. So defined, the planting of grasses for the purposes heretofore detailed is a cultivation of the land. The evidence is clear that under this definition the farm has been maintained in a good state of cultivation.

The evidence is not disputed that the research data accumulated by the use of the farm as a beef cattle breeding research experiment station has been for the benefit of students attending the College of Agriculture. Students have inspected the farm and the experiments being carried on. Cattle have on occasion been removed to the College of Agriculture campus for instructional purposes. In addition thereto the farm has been used

to instruct students in proper conservation practices and soil building, the use of grass cover to eliminate or decrease erosion, the root structure of various grasses, particularly brome grass and alfalfa, and the resulting benefits to depleted soil. The evidence clearly demonstrates that the farm was used for the benefit of students attending the College of Agriculture. It can hardly be disputed, as the evidence shows, that cattle raising is an agricultural pursuit and within the meaning of the expression "promotion of agriculture," as that term is used in the will.

The plaintiffs take the position that the income from the farm has been reduced by the seeding of a large part of the land to brome grass and alfalfa. Plaintiffs frankly admit that they do not believe in conservation programs and infer that the conditions of the will have been violated because of the departure from the traditional manner in which the land had been farmed previous to its devise to the Board of Regents. The designation of the farm as an experiment station implies changes in the method of operation and negates any idea that it was to be operated primarily for income purposes. It is evident from the terms of the devise that the main purposes of the testatrix were to provide a suitable memorial to her son and husband who had predeceased her, and to have the land used for the promotion of agriculture and for the benefit of students at the College of Agriculture. The specific use to which it was to be put within the general use prescribed was not designated. The specific use was left to the judgment of the Board of Regents. We conclude that the Board of Regents has substantially complied with the terms of the devise and accomplished the purposes of the testatrix as set forth in the will. Such being true, no basis for a forfeiture of the devise exists.

The foregoing conclusions are supported by the following rules of law: A devise which conveys property

in fee simple to which are attached conditions for the violation of which a forfeiture may be declared by contingent devisees, creates an estate in fee simple subject to conditions subsequent. Ohm v. Clear Creek Drainage Dist., 153 Neb. 428, 45 N. W. 2d 117. Estates upon condition subsequent, which, after having become fully vested may be defeated by a breach of condition, are not favored in law. Such condition will be liberally construed to avoid a forfeiture. Majerus v. Santo, 143 Neb. 774, 10 N. W. 2d 608; Plummer v. Fie, 167 Neb. 367, 93 N. W. 2d 26. To constitute a breach of condition subsequent in a devise as to maintenance or use of land conveyed, there must be such neglect to comply as to indicate an intention to disregard the condition. Burrows v. Madison Park & Pleasure Drive Assn., 177 Wis. 639, 189 N. W. 535; St. Clara College v. City of Madison, 250 Wis. 538, 27 N. W. 2d 745; Koonz v. Joint School Dist. No. 4, 256 Wis. 456, 41 N. W. 2d 616. It is not enough to show that the letter of the condition is violated, but it must appear that its true spirit and purpose have been intentionally disregarded by the devisee. Rose v. Hawley, 141 N. Y. 366, 36 N. E. 335.

Under these fundamental rules, and the facts and circumstances shown by the evidence, we conclude, as did the trial court, that the Board of Regents has substantially complied with the conditions imposed on it by the will of Cora E. Rogers and that no basis exists for a forfeiture of the estate devised to such board.

AFFIRMED.