526 A.2d 996

**HOWARD COUNTY, Maryland,**

v.

**Phillip CARROLL.**

**No. 1566, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

June 12, 1987.

636

F. Todd Taylor, Jr., Asst. Co. Sol. (Barbara M. Cook, Co. Sol., on the brief) Ellicott City, for appellant.

Susan S. James (James L. Mayer, on the brief), Ellicott City, for appellee.

Argued before GILBERT, C.J., and BLOOM and KARWACKI, JJ.

BLOOM, Judge.

Appellee, Phillip Carroll, was cited by the Sediment Control Division of the Howard County Department of Public Works for violating Section 3.402 of the Howard County Code prohibiting grading without a permit and an approved sediment control plan. He brought a declaratory judgment action in the Circuit Court for Howard County to determine the constitutionality of the Sediment Erosion and Control Ordinance, §§ 3.400–3.409 of the Howard County Code, and the applicability of that ordinance to the activities conducted on his property. Judge Guy J. Cicone, sitting without a jury, upheld the constitutionality of the ordinance, but found that Carroll's activities were exempted from its operation by section 3.402(c)(1) of the Howard County Code because those activities constituted "agricultural land management practices." Howard County appeals from that adverse decision.

The sole issue presented on appeal is whether the trial court erred in concluding that appellant's activities were exempt from the provisions of the Howard County Sediment and Erosion Control Ordinance. For the reasons set forth below, we shall affirm the decision of the circuit court.

## I. Statutory Framework

Section 8–1103(e)(2)(i) of the Md. Natural Resources Code Ann. (1983 Repl.Vol. & 1986 Supp.) empowers the Department of Natural Resources to delegate to qualifying counties and municipalities the authority to enforce compliance with the provisions of the State's Sediment Control Law, sections 8–1101—8–1108. Sections 3.400–3.409 of the Howard County Code were enacted pursuant to Section 8–1103(e)(2)(i).

The purpose of the Howard County Sediment Erosion and Control Ordinance, as stated in Section 3.400, is:

to protect, maintain and enhance the public health, safety, and general welfare by establishing minimum requirements and procedures to control the adverse impacts associated with accelerated soil erosion and resultant sedimentation. Minimizing soil erosion and off-site sedimentation will minimize damage to public and private property, and assist in the attainment and maintenance of water quality standards.

Pursuant to section 3.402(a), the ordinance applies to any person who "clear[s] or grade[s] land" except those specifically exempted from its operation under section 3.402(c). Clearing refers to "[a]ny activity which removes the vegetative ground cover." Section 3.401(d). By definition, to grade is "[t]o cause disturbance of the earth. This shall include but not be limited to any excavating, filling, stockpiling of earth materials, grubbing, root mat or top soil disturbance, or any combination of them." Section 3.401(1). Those whose operations are not specifically exempted are required, under sections 3.402(b) and 3.403(a), respectively, to obtain a grading permit from the Bureau of Inspections, Licenses and Permits of the Department of Public Works and to obtain approval of an erosion and sediment control plan from the Howard County Soil Conservation District.

As does its state counterpart, section 8–1102 of the Natural Resources Article, section 3.402(c)(1) of the Howard County Code provides that a grading permit and approved sediment control plan are not required for grading or clearing associated with "agricultural land management practices." While that term is not defined in the state statute, section 3.401(b) of the County Code defines "agricultural land management practices" as involving "[t]hose methods and procedures used in the cultivation of land in order to further crop and livestock production and conservation of related soil and water resources. Logging and timber removal operations may not be considered a part of this definition."

We shall now proceed to examine the evidence presented below regarding appellee's operations.

## II.  Facts

Appellee is a farmer by occupation.  His property, Doughoregan Manor, contains 2,400 acres of land, of which 1,100 acres are farmed.  There is a ravine on the farm, approximately 2 to 4 acres in size.  Sometime in 1981 appellee granted an exclusive license to Fred Allnutt, a commercial excavator, to dump various organic materials—trees, stumps, brush, dirt—into the ravine.[1]

Allnutt, the excavator, testified about the landfill operations.  He noted that when the operation began trees that were in the gully had to be taken down and the gully had to be widened to get the dirt needed to cover over the trees.  Later, dirt was stockpiled to finish the filling.  Allnutt also discussed various sediment control measures taken in filling the ravine.  A pond was created to "catch silt" and as a "holding area for the trees."  In addition, the trees and brush dumped acted as "natural retainers" of silt.  He considered the berm seeded on the back side of the ravine, combined with the "ponding effect" in front, to be the "prime preventer[s] of silt from going onto any other property."  His inspections revealed these measures had been effective in preventing any sediment runoff.

Appellee's primary purpose in having the ravine filled was to create additional tillable land on his property.[2]  In fact, by this filling process, approximately four acres of

---

1.  In its brief, appellant refers repeatedly to the "other rubble" that was dumped in the ravine.  The trial judge, however, ordered any reference to "rubble" stricken on the ground that the testimony indicated that nothing other than organic fill was used.  On one occasion, a chunk of concrete was placed in the ravine but was removed as soon as appellee learned of its presence.

2.  Appellee testified to other advantages as well.  The ravine was in the midst of acreage that was regularly farmed with crops.  By making the ravine level, there would no longer be any need to drive heavy farm equipment around the gulch.  In addition, Allnutt paid appellee $40.00 per truckload for the privilege of dumping the organic material into the ravine.

land has been rendered useful to the production of crops. At trial, appellee noted that he had obtained a permit in 1985 from the Office of Environmental Programs, Department of Health & Mental Hygiene, authorizing a landfill "consisting only of tree stumps, brush and clean earth."

Kenneth Warfield, a Howard County farmer, testified that the activities appellee engaged in were commonly used by farmers to produce additional arable land. The organic fill made the land more fertile. Reducing the slopes of a ravine served to prevent soil erosion. He was unaware of any other farmers who had been required to obtain a grading permit for similar operations.

Alfred Tate, appellee's crop manager, testified that filling the ravine in the manner conducted had the triple benefits of creating additional tillable land, stopping soil erosion and making it easier for the workers to farm the crop land surrounding the former ravine. He asserted that in approximately 30 days the formerly inhospitable ground would be sowed in grain. Tate further testified that the additional cuts made into the land around the ravine were necessary to divert sediment problems. Had the cuts not been made, "you'd have a feather edge like filling, like pouring too much water in a 'bathtub'" and the dirt and limbs would flow away.

Robert Ziehm, District Manager for the Howard County Soil Conservation District, testified on behalf of the County. He stated that the District's Board of Supervisors concluded appellee's activities did not constitute an "agricultural land management practice" for the following reasons:

> Basically, what the sediment control ordinance says in relation to agricultural land management practices is that they are those methods and procedures used in the cultivation of land. It makes no reference to creation of land, the reclamation of land, the renovation of land, or any similar activity. So the Board looked at it from the standpoint of, what would be appropriate in an agricultural situation for that kind of operation. And what they ... contemplated was has Mr. Carroll come to the

District and requested assistance ... for purposes of ... healing the gully that was there and eventual cropping of that land, what would we have recommended. And they decided that ... because of the magnitude of the job and the extent of it and the ... fact that it had expanded over a period of several years, that it was, well beyond the scope of anything that we would have recommended, and certainly not in compliance with ... the standards and specifications for sediment control. They looked at the fact that not only was ... a gully being healed by the filling operation, but that additional undisturbed area was being excavated to depths of twenty or thirty feet and widths of twenty or thirty feet to create additional fill area.... Using organic debris in a fill is specifically prohibited by both [the] Soil Conservation Service, agricultural specifications, and it's also strictly prohibited in the standards and specifications for sediment control, which is the state wide document for sediment control plan approval.

Ziehm further testified that appellant's intent to produce tillable land was not relevant to the Board's decision. While he believed better sediment control practices should have been utilized, Ziehm admitted that "[the Board] looked specifically for evidence of sediment leaving the site and we found none."

On cross-examination, Ziehm retrenched somewhat on his position. He admitted that the Board's recommendations for sediment control practices were irrelevant if appellee were exempt under the statute. He further conceded that appellee had created farmland for crop production and acknowledged that it was not within the Board's purview to disallow the filling of a gully to produce agricultural land.

Richard Powell, Chief of the Sediment Control Division for the county, testified he believed that appellee's activities did not constitute an agricultural land management practice because appellee had gone beyond mere filling of an existing gully and, by large cuts, had created an additional area needing to be filled.

The court, in its oral ruling at trial, concluded that appellee's practices were exempt under section 3.402(c)(1) for these reasons: (1) although the activities were "admittedly vast in scope, [they were] nonetheless agricultural in nature"; (2) the expressed intent of appellee was to create tillable land and such land was, in fact, created; (3) there was no evidence of soil erosion as a result of appellee's practices; (4) appellee had obtained the aforementioned permit from the Department of Health authorizing the landfill operation.

### III. Law

Appellee is incorrect in his presumption that the "clearly erroneous" standard of Rule 1086 applies to the instant case. That standard is applicable only to the findings of fact of a trial judge sitting without a jury. *Sica v. Retail Credit Company,* 245 Md. 606, 611, 227 A.2d 33 (1967); *Suburban Properties, Inc. v. Mayor and Council of Rockville,* 241 Md. 1, 6, 215 A.2d 200 (1965); *Moon v. Weeks,* 25 Md.App. 322, 328 n. 4, 333 A.2d 635 (1975); *Pappas v. Modern Manufacturing Co.,* 14 Md.App. 529, 538, 287 A.2d 798 (1972). Here we are not concerned with judicial fact-finding; the material facts in this case are undisputed. The question presented, requiring an interpretation of a statutory term, is thus purely one of law. *Sica supra,* 245 Md. at 611, 227 A.2d 33; *Montgomery County v. Lake,* 68 Md.App. 269, 273, 511 A.2d 541 (1986); *Pappas, supra,* 14 Md.App. at 538, 287 A.2d 798. The issue before Judge Cicone and, therefore, before us, is whether appellee's activities—filling the ravine and, in the process, cutting the sides of the existing ravine—fall within the ordinance's exemption for agricultural land management practices.[3]

---

3. Appellant initially urged in its brief that appellee's "dumping activity, in and of itself, is not the subject of this proceeding. Howard County ... is concerned with the cutting of the earth on the adjacent sides of the [existing] ravine and covering ... the pile of debris with dirt after each load." Yet, it later states in its brief that "there was no basis upon which a court could conclude that the indiscriminate dumping of trees, stumps [etc.] was equivalent to tilling the land for

In resolving that issue, we are guided by certain principles of statutory construction, which apply as well to the interpretation of county ordinances. *Prince George's County v. Equitable Trust Co., Inc.,* 44 Md.App. 272, 280, 408 A.2d 737 (1979), *cert. denied,* 287 Md. 751 (1980). The cardinal rule of statutory construction is to ascertain and effectuate the actual intent of the Legislature. *Reid v. State,* 302 Md. 811, 816, 490 A.2d 1289 (1985); *Management Personnel Services, Inc. v. Sandefur,* 300 Md. 332, 341, 478 A.2d 310 (1984); *Soper v. Montgomery County,* 294 Md. 331, 335, 449 A.2d 1158 (1982).

The legislative intent is to be sought, in the first instance, in the language of the statute itself, *Mayor and City Council of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174 (1984); *Comptroller of the Treasury v. John C. Louis Co., Inc.,* 285 Md. 527, 538, 404 A.2d 1045 (1979); *Department of Motor Vehicles v. The Greyhound Corporation,* 247 Md. 662, 668, 234 A.2d 255 (1967). If there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislative body. *Mayor and City Council of Baltimore, supra,* 300 Md. at 283, 477 A.2d 1174; *Bright v. Unsatisfied Claim and Judgment Fund Board,* 275 Md. 165, 169, 338 A.2d 248 (1975); *Dept. of Motor Vehicles, supra,* 247 Md. at 668, 234 A.2d 255; *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 478, 209 A.2d 582 (1965).

---

crop production and hence an agricultural land management practice...."

Adding to the confusion was this statement at the conclusion of appellant's brief:

The Sediment Control Law does not prohibit the dumping of [material] on the appellee's property. It does not prevent the appellee from obtaining more tillable acreage. The only requirement ... is that a grading permit be obtained and a sediment control plan be filed if the ground is in any way disturbed. When the commercial contractor began to move dirt from the sides of the adjoining hill ... his activities fell within the parameters of the Sediment Control Law.

The words in a statute are to be accorded their ordinary and popular meaning, in the absence of a contrary legislative intention. *Rome v. Lowenthal,* 290 Md. 33, 41, 428 A.2d 75 (1981); *Vallario v. State Roads Commission,* 290 Md. 2, 6, 426 A.2d 1384 (1981); *Police Commissioner of Baltimore City v. Dowling,* 281 Md. 412, 418, 379 A.2d 1007 (1977); *Harden v. Mass Transit Administration,* 277 Md. 399, 406, 354 A.2d 817 (1976).[4]

Only where the language of the statute is of uncertain or doubtful meaning may the courts resort to extrinsic aids in their construction of a statute. *Willis v. State,* 302 Md. 363, 374–75, 488 A.2d 171 (1985). Where such ambiguity exists the court, in determining legislative intent, will not only consider the usual and literal meaning of the words used, "but their meaning and effect ... in the light of the objectives and purposes of the enactment and the consequences resulting from one meaning rather than another meaning...." *Truitt v. Board of Public Works,* 243 Md. 375, 394, 221 A.2d 370 (1966); *Woodmont Country Club, Inc. v. Montgomery County,* 61 Md.App. 229, 236, 486 A.2d 218 (1985). The courts may also consider the statute's legislative history and administrative interpretations of a statute when more than one reasonable interpretation is possible. *Board of Education of Montgomery County v. Montgomery County,* 237 Md. 191, 198–99, 205 A.2d 202 (1964); *County Treasurer for Caroline County v. State Tax Commission of Maryland,* 219 Md. 652, 657, 150 A.2d 452 (1959).

Because the interpretation of a statutory provision exempting certain activities from its scope is involved, we are constrained to apply a strict construction analysis. *Securi-*

---

4. Section 3.401 of the Howard County Code itself provides that the "[w]ords and phrases used in this subtitle shall have their usual meanings" except where such words or phrases are defined within. While section 3.401(b) defines the term "agricultural land management practices," and we may not add or detract from the definition used, the words used to define the term must be given their ordinary and usual meanings.

*ties and Exchange Commission v. American Int'l Savings and Loan Association, Inc.,* 199 F.Supp. 341, 347 (D.Md. 1961); *Johns v. Hodges,* 62 Md. 525, 537 (1884). Strict construction, however, simply means that a statute is not to be construed beyond its natural meaning.

> [The term] is not the exact converse of liberal construction for it does not consist in giving the words of a statute the narrowest meaning of which they are susceptible [citation omitted] and "strict construction" is in no way violated if the words of a statute are given their full meaning. [Citation omitted.] The term "excludes mere implications, but does not require a literal and blind adhesion to mere words."

*McKeon v. State,* 211 Md. 437, 443–44, 127 A.2d 635 (1956).

The term "agricultural land management practices," as previously noted, refers to those methods and procedures "used in the cultivation of land in order to further crop and livestock production *and* conservation of related soil and water resources." Appellant, looking only to the first portion of the definition, contends that appellee's activities did not constitute "cultivation of land in order to further crop ... production" because there is no reference in the ordinance's definition to "the creation of land, the reclamation of land, the renovation of land, or any similar activity" and because the word "cultivation," as popularly defined, does not clearly encompass the types of activities in which appellee engaged. Appellee contends that his activities would fall within either prong of the ordinance's exemption because they involved cultivation for crop production and were conservation related. Like appellant, he does not consider the words used to define "agricultural land management practices" to be ambiguous, and urges that his activities were encompassed within their ordinary meaning.

We shall examine the ordinary meaning of the key words used in defining the term "agricultural land management practices" to determine whether they are reasonably susceptible of more than one meaning.

"Cultivation" simply refers to the act of cultivating so we must look to definitions of the verb "cultivate." *A New English Dictionary on Historical Principles* (Oxford 1893) defines the verb "cultivate" as meaning "to bestow labour and attention upon (land) in order to the raising of crops; to till; to improve and render fertile by husbandry." *The Random House Dictionary of the English Language* (Unabridged ed. 1966) similarly defines the word as "to prepare and work on (land) in order to raise crops; till; to use a cultivator on; to promote or improve the growth of (a plant, crop, etc.) by labor and attention." *Webster's Third New International Dictionary* (Unabridged 1976) states the verb means "to prepare for the raising of crops: prepare and use for such a purpose: till (the soil)." *Webster's New World Dictionary of the American Language* (Encyclopedia Edition 1951) defines the verb as follows: "to prepare and use (soil, land, etc.) for growing crops; till; to break up the surface soil around (plants) in order to destroy weeds, prevent crusting, and preserve moisture."

While there are no Maryland decisions defining the words, the courts of other states have accorded similar meanings to "cultivate" and "cultivation" in a wide variety of contexts. *See, e.g., United States v. Niemeyer,* 94 F. 147, 150 (1899) (plowing and preparing land for crops); *United States v. Shinn,* 14 F. 447, 452 (1882) (act or process involving the improvement or amelioration of the soil); *Erskine v. Board of Regents of the University of Nebraska,* 170 Neb. 660, 104 N.W.2d 285, 291 (1960) (cultivation refers to more than stirring or turning the soil; it connotes a directed use of land as contrasted to its use in a natural state); *Snow v. Snow,* 75 A. 881, 881 (N.H. 1910) ("state of cultivation" is the converse of a state of nature); *In re Property Extending from Flushing Bay to Interborough Parkway,* 166 Misc. 864, 2 N.Y.S.2d 374, 377 (1937) (to improve product of the earth by manual industry); *Voight v. Meyer,* 59 N.Y.S. 70, 72, 42 App.Div. 350 (1899) (to improve the product of the earth by manual industry); *State v. Allen,* 35 N.C. 36, 37 (1851) (till or husband the

ground; to forward the product of the earth by general industry); *Cities Service Pipeline Co. v. Stidham,* 368 P.2d 1007, 1009 (Okla.1962) (cultivation is art and process of agriculture; tillage; husbandry); *Miller v. Richey,* 173 S.W.2d 490, 493 (Tex.1943), *aff'd,* 142 Tex. 274, 177 S.W.2d 255 (1944) (to plow; prepare for crops; manage and improve in husbandry).

■ In its narrow, colloquial sense, the word "cultivation" refers to the turning or tilling of soil. *Erskine, supra,* 104 N.W.2d at 285. However, we are not constrained to adopt the most narrow view possible of the term. We are entitled, nay required, to accord to the word "cultivation" its "full meaning." *McKeon, supra,* 211 Md. at 444, 127 A.2d 635. A review of the above-cited definitions indicates that the term "cultivation" has a broader meaning than merely tilling land and encompasses efforts "to bestow labour and attention" upon land to further crop production and to prepare or improve land to further crop production. It has even been viewed as connoting an agricultural, as opposed to non-agricultural, use of land.

■ Appellant persists in viewing appellee's activities as "making new land," which it believes is too far removed from the tilling of soil to be agricultural in nature. We see the process as altering the contour of land. When such contouring is undertaken for the primary purpose of making the land tillable, as was found to be the case here, it comes within the meaning of "cultivation."

■ We hold, therefore, that appellee's activities, both in filling the ravine and cutting away at its existing sides to provide soil for cover, being agricultural in nature and intent, constituted "cultivation of land in order to further crop ... production." The above-quoted definitions of "cultivate" draw no distinctions between acts or procedures preparatory to the tilling or seeding of ground and the actual tilling or seeding of ground. By appellee's actions, the land was improved and prepared for the eventual, although not instantaneous, receipt of seed. All of appel-

lee's activities were part and parcel of the *process* of cultivation.

If appellant were correct in its interpretation of the statute, it would mean that virtually *nothing but* the actual tilling, turning of the soil for seed receipt, would be exempted under the ordinance. Any number of procedures essential to making land arable and capable of production—terracing, grading, the digging of ditches for irrigation or drainage—would not be exempt.

Other courts have held that these essential activities are encompassed within the term "cultivation" or "agriculture." *Erskine, supra,* 104 N.W.2d at 290–91 (terracing of slopes, efforts to resist further depletion by erosion constitute cultivation); *Bigwood Canal Co. v. Unemployment Compensation Board,* 61 Idaho 247, 100 P.2d 49, 50 (1940) (irrigation is part and parcel of "agricultural labor"). Had the legislators adopting the exemption here at issue intended to give the farmer so lean a reed as a bulwark against regulatory infringement, they would have defined more narrowly the term "agricultural land management practices."

We further note that the definition accorded "agricultural land management practices" is very similar to the usual and ordinary definition of "agriculture." The ordinance's exemption encompasses cultivation of land and conservation, but excludes timber and logging operations. The term "agriculture" has been accorded a similar meaning in dictionaries and judicial opinions. *See Webster's Third New International Dictionary* (Unabridged 1976) (the science or art of cultivating the soil, harvesting crops, and raising livestock); *Van Clief v. Comptroller,* 211 Md. 191, 195, 126 A.2d 865 (1956) (to the same effect); *Keeney v. Beasman,* 169 Md. 582, 586–87, 182 A. 566 (1936) (to the same effect); *Collins v. Mills,* 198 Ga. 18, 30 S.E.2d 866, 869–70 (Ga. 1944); *Smythe v. Phoenix,* 63 Idaho 585, 123 P.2d 1010, 1012–13 (1942); *DeFontenay v. Childs,* 93 Mont. 480, 19 P.2d 650, 651 (1933). The ordinance's definition is also similar to the usual definition of farming. *See The Aetna*

*Casualty and Surety Company v. The Brethren Mutual Insurance Co.*, 38 Md.App. 197, 207, 379 A.2d 1234 (1977), *cert. denied*, 282 Md. 730 (1978) (the business of cultivating land, raising stock, agriculture, husbandry).

■ To a large degree, then, the terms "agriculture," "farming," "cultivation" and the legislative definition of "agricultural land management practices" are synonymous. This interrelationship supports the conclusion the exclusion at issue has a broad meaning.

Appellee's activities in cutting the sides of the existing ravine, moreover, constituted the "conservation of related soil ... resources." There was testimony below that the cutting and placing of soil in the ravine was conservation related because the activities helped to prevent soil erosion.

Appellant complains that the extent of appellee's cutting operations placed them outside the scope of the exemption for agricultural management practices. We agree with the trial judge below that while appellee's cutting operation was "admittedly vast in scope," his purpose was clearly to cultivate land and prevent soil erosion. The Howard County ordinance does not differentiate between small and large grading operations. It is the nature, and not the extent of the operations involved, which is relevant to the construction and application of the ordinance's exemption for agricultural land management practices. Nor is it relevant that appellee could have used better methods to achieve his purposes.

Finally, we may consider the exemption under section 3.402(c)(1) in relation to other segments of the Howard County ordinance. As previously mentioned, section 3.401(1) of the Code defines the term "grade" as "to cause disturbance of the earth. This shall include but not be limited to any *excavating, filling,* stockpiling of earth materials, grubbing, root mat or *topsoil disturbance,* or any combination of them." (Emphasis added.)

Section 3.402(c) provides that "grading ... associated with" agricultural land management practices is exempt

from the ordinance. Necessarily, "filling," "excavating" or "topsoil disturbance" associated with the cultivation of land or conservation of related soil is exempt.

Appellant argues further that we are constrained to give deference to the interpretation placed upon the statutory exemption by the administrative officials charged with enforcement of the Sediment Erosion and Control Ordinance. Appellant cites certain authority for the proposition that an administrative construction which is not plainly inconsistent with the statute should not be disregarded except for the strongest and most urgent reasons. *See Holy Cross Hospital of Silver Spring, Inc. v. Health Services Cost Review Commission*, 283 Md. 677, 685–86, 393 A.2d 181 (1978); *Jamison v. Browning*, 61 Md.App. 405, 410, 486 A.2d 810 (1985); *B & O Railroad v. Bowen*, 60 Md.App. 299, 305, 482 A.2d 921 (1984). As previously mentioned, however, we are prohibited from giving *any* consideration to an administrative construction unless the language being construed is of doubtful meaning.[5]

---

**5.** We further note that even had we considered the language of the ordinance to be ambiguous, an administrative agency's interpretation is not always entitled to great weight, as appellant contends. In *Comptroller of the Treasury, supra*, 285 Md. at 543–44, 404 A.2d 1045, the Court of Appeals set forth the various factors to be considered in determining the weight to be accorded an agency's interpretation: (1) the consistency of the administrative interpretation or practice with the purposes of the statute; (2) the thoroughness, breadth and validity of the considerations underlying the administrative interpretation; (3) whether the interpretation resulted from a contested adversary proceeding or from a promulgated administrative decision, rule, regulation or departmental statement; (4) the consistency and length of the administrative interpretation; (5) whether the agency failed to enforce the statute. *See also Baltimore Gas and Electric Company v. Public Service Commission of Maryland*, 305 Md. 145, 161–62, 501 A.2d 1307 (1986).

Application of the above factors to the case *sub judice* compels the conclusion that the agency's interpretation of the statute is entitled to little, if any, weight. The interpretation placed on the statutory exemption by the Board of Supervisors of the Howard County Soil Conservation District was not the product of an adversial proceeding, a promulgated rule or other publicly established decision. The Board simply made an *ad hoc* determination post-inspection of appellee's property. The agency's interpretation was neither contemporaneous

Finally, appellant argues that to give section 3.401(c)(1) such a broad reading would contravene the stated purposes of the county ordinance, that is, to promote the public welfare by "minimizing soil erosion and off-site sedimentation." However egregious that effect might be, we cannot avoid the clear import of the language of the legislative exemption, nor can we ignore the fact that county legislators have determined that agriculture is an activity to be encouraged and, accordingly, have specified that farmers may do what others may not.

The last words in Voltaire's *Candide,* "Il faut cultiver notre jardin" may well be susceptible to more than one meaning, but the words used in the ordinance to define agricultural land management practices are not.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

with enactment of the Sediment Erosion Control Ordinance, nor could it be considered to be a long, uninterrupted and unvarying administrative interpretation. In fact, it appears that this was the first time the issue had ever been considered by the Board or Conservation District. Nor can we say the Board's analysis, as testified to by Mr. Ziehm, was particularly well-reasoned. At least two of the three factors considered by the Board in reaching its determination—the inadequacy of the measures used by appellee from a soil erosion standpoint and the material going in the landfill—were not relevant to whether appellee fell within the statute's exemption. As Ziehm admitted at trial, those matters were relevant only *after* there was a determination appellee indeed did not fall under the exemption. Finally, there was testimony other farmers in Howard County had filled ravines with organic debris, but had not been required to obtain a grading permit.

The finding of any one of these factors has been held sufficient, in the past, to justify giving either little or no weight to the agency's interpretation. *See e.g., Comptroller of the Treasury, supra,* 285 Md. at 545, 404 A.2d 1045; *B & O Railroad Co., supra,* 60 Md.App. at 305, 482 A.2d 921.