767 A.2d 372

**Naji P. MALOOF**

v.

**STATE of Maryland, DEPARTMENT OF the ENVIRONMENT.**

**No. 2228, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Feb. 28, 2001.

684

R. Calvert Steuart, Largo, for Appellants.

J. Van Lear Dorsey, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before HOLLANDER, THIEME,* ADKINS, JJ.

HOLLANDER, Judge.

In this case we must analyze the scope of authority conferred by statute and regulation upon the Maryland Department of the Environment to regulate the disposal of solid waste, particularly land clearing debris. The matter arises from a dispute between Naji P. Maloof and Parkers Wharf, LLC,[1] appellants, and the Maryland Department of the Envi-

---

* Thieme, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. Maloof is the only party identified as an appellant in appellants' brief. Moreover, in its opinion, the trial court refers only to Maloof as a

ronment ("MDE" or the "Department"), appellee, concerning appellants' operation of a landfill on their Calvert County farm, without a permit, allegedly in violation of Md.Code (1982, 1998 Repl.Vol., 2000 Supp.), § 9–204(d) of the Environment Article ("E.A."), and the Code of Maryland Regulations ("COMAR"). The landfill contained land-clearing debris that commercial excavators transported to appellants' farm for a fee. According to Maloof, the purpose was to create additional pastureland for his livestock.

On July 30, 1999, MDE filed suit in the Circuit Court for Calvert County against Maloof, seeking injunctive relief and civil penalties based on his operation of a landfill without a permit. The suit was amended to add Parkers Wharf as a defendant. The dispute led to an evidentiary hearing on September 1 and 15, 1999, as well as a site visit by the court, and culminated in a Memorandum and Order dated October 8, 1999 (Chappelle, J.), granting a preliminary injunction that enjoined Maloof from operating "an open dump, land clearing debris landfill, or refuse disposal system."

Appellants timely noted their appeal and present two questions for our review, which we have rephrased:

I.  Did the circuit court properly determine that appellants violated the laws and regulations governing solid waste disposal by operating the landfill without a permit?

II. Did the lower court err or abuse its discretion in granting injunctive relief?

For the reasons that follow, we shall affirm.

## FACTUAL SUMMARY

Maloof operates a farm at 6755 Parker's Wharf Road in Calvert County. The land is owned in fee simple by Parkers Wharf, LLC. Maloof contends that by filling several areas on

---

defendant. But, in its Amended Complaint, MDE sued both Maloof and Parkers Wharf, and both defendants noted an appeal. At oral argument, counsel for appellants acknowledged that both Maloof and Parkers Wharf are "technically" appellants.

his farm with stumps, limbs, rubble, and other land-clearing debris, he sought to create additional flatland on his farm to use as pasture for his livestock. He obtained the land-clearing debris from various commercial excavators who paid fees to him to dump their debris.

On February 22, 1999, an anonymous phone call alerted MDE to Maloof's activities at his farm. A representative of the Department then made an unannounced visit to Maloof's property on February 24, 1999, but was not permitted to enter the premises. MDE inspectors were also denied access to the property on March 25, 1999. On April 14, 1999, MDE agents observed activities on the Maloof property from outside its gates, noting at least three trucks entering the property hauling land-clearing debris and departing the premises without the debris. Ground level photogrpahs were also taken. On July 7, 1999, MDE took aerial photographs of the Maloof property, which showed land-clearing debris, as well as vehicles "approaching and moving away from the debris pile. . . ."

On July 30, 1999, MDE filed a complaint for preliminary and permanent injunctive relief and civil penalties, alleging that appellants' landfilling practices posed significant health and environmental risks, and violated Maryland statutory and regulatory law. Additionally, MDE filed a motion seeking immediate access to appellants' property. The court granted that motion and, on August 4, 1999, MDE conducted an on-site inspection of Maloof's property.

The Department ascertained that appellants' property was divided into three parts: Area A; Area B; and Area C. Area A totals four to five acres in size. In a three-acre section of Area A, MDE observed piles of land-clearing debris on top of buried land-clearing debris. The combined height of the two piles reached approximately twenty feet. Area B is about one and a half acres in size, and a one-acre section of it contained land-clearing debris covered with soil. Additionally, the edge of Area B sloped off, and a section of exposed land-clearing debris had been put into a ravine. Area C appeared to have been recently filled with landfill debris, but it had no soil

cover. The inspectors did not observe any soil erosion or fire control measures at the site.

An inspector returned to the Maloof property on August 26, 1999, and noticed that a silt fence had been placed below Area A near a stream. The fence was not adequate to prevent runoff from the landfill to prevent pollution of the stream.

Based on the on-site observations, MDE filed an Amended Complaint on September 8, 1999, which added several new claims, including allegations of construction of a waterway obstruction without a permit (Count II); unlawful water pollution (Count III); failure to obtain a discharge permit (Count IV); and nontidal wetlands violations (Count V).[2] With respect to the request for a preliminary injunction, the court held an evidentiary hearing that began on September 1, 1999, and continued on September 15, 1999. We shall briefly review the evidence adduced at the hearing.

Heather Nelson, an MDE employee, testified that during the site inspection on August 4, 1999, she observed land-clearing debris on the site as well as a dump truck unloading additional land-clearing debris. She also testified that, in Area A, the debris had been dumped around some free standing trees, and the area surrounding these trees served as "hot pockets," from which heat generated by decaying debris could escape. Nelson added that the depth of the fill in Area A was approximately ten feet.

Richard Glover, a sanitarian for the State, testified that he observed trucks bring debris to the site in April 1999, and photographed the dumping during the August inspection. Glover also testified that in an aerial inspection of the property in July 1999, he observed a front end loader moving debris on the property. Several photographs were presented to support Glover's testimony.

James Grainer, an excavator who hauls land-clearing debris, also testified for the Department. He admitted that he had

---

2. Many of the claims in the Amended Complaint are not pertinent to this appeal.

received an invoice from Maloof for the dumping of debris, but was unable to specify where the material had been dumped.

Robert Hartlove, the Regional Forest Fire Protection Supervisor for the Department of Natural Resources, testified as an expert for MDE. In his opinion, there was a risk of subterranean fire in the filled area. In addition, the access around Area A was inadequate to accommodate fire equipment in the event of a fire.

Edward Dexter, a geologist and the Chief of the Field Operations and Compliance Division of MDE's Solid Waste Program, testified as an expert in solid waste management, including pollution control at solid waste facilities. He indicated that material from the filled areas might leach into a downhill stream because of the lack of adequate barriers to prevent the discharge of sediment and pollutants. Dexter also stated that appellants did not have a permit to operate a land-clearing debris landfill. As no permit had been issued to appellants for a land-clearing debris landfill on the property, Dexter classified the site as an "open dump," as defined by COMAR 26.04.07.02.[3]

The defense did not dispute that land-clearing debris had been brought to appellants' farm. Perry Bowen III, who testified for appellants, acknowledged that Maloof received compensation from businesses that were allowed to dump land-clearing debris. He also acknowledged that appellants did not have a soil erosion plan for the site. But, Bowen claimed that the use of land-clearing debris is a traditional method of altering the existing grade or contours of land, and is done to fill in gullies or ravines in order to make the land suitable for various farm purposes, such as livestock grazing. Ward Cattington, Jr. testified as an expert in the field of fire prevention. He denied having seen any hot pockets during his on-site inspection. But, he conceded that he was not present when the court inspected the property on September 15, 1999.

---

3. MDE called Maloof as a witness, but he declined to answer any questions based on his Fifth Amendment privilege.

As noted, the judge visited the property on September 15, 1999. At that time, he saw "smoke coming out of the ground," where land clearing debris had been packed around trees.

On October 8, 1999, the court issued a memorandum and order granting the preliminary injunction. The court found that appellants operated a "refuse disposal system for public use," as defined in COMAR 26.04.07.02B(30). It also concluded that appellants operated a land-clearing debris landfill, without a permit, in violation of E.A. § 9–204 and COMAR 26.04.07.11. The court reasoned, in part:

In applying the above referenced statutes and regulations to the current case the Court concludes that as the Defendant operated a landfill, he was operating a "refuse disposal system" as Section 9–201(e) of the Environment Article indicates that a landfill is a refuse disposal system. His refuse disposal system is further a system of refuse disposal for public use as defined in COMAR 26.04.07.03(30) because the Defendant's property was the final disposal place for solid waste that was generated by more than one individual or single corporation. Therefore, pursuant to Environment Article Section 9–204, and COMAR 26.04.07.03B, Mr. Maloof needs a permit issued by the Secretary to operate this landfill. The Court further concludes that the Defendant has operated a Land Clearing Debris landfill without a valid permit in violation of Section 9–204 of the Environment Article of the Maryland Annotated Code and COMAR 26.04.07.11. The Court respectfully rejects the Defendant's contention that "the plain language of the controlling statute reflects, to be a refuse disposal system, the operation must be some type of 'solid waste acceptance facility' such as a landfill.".... The Court determines that Section 9 201(e) indicates that a landfill is a refuse disposal system without requiring that the landfill also meet the definition of a solid waste acceptance facility. The issue then becomes should the preliminary injunction be issued based on the above facts and statutory framework.

We shall include additional facts in the discussion.

## DISCUSSION

### I.

■ We must consider the propriety of the circuit court's ruling granting the preliminary injunction. An "injunction" is "a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience." 12 Maryland Law Encyclopedia, *Injunctions* § 1 at 250 (1961). Maryland Rules 15–501 through 15–505, which derive from former Rule BB70, refer to three types of injunctions: the temporary restraining order, the preliminary injunction, and the injunction. *See Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.,* 117 Md.App. 290, 294 n. 1, 699 A.2d 1209, *cert. denied,* 347 Md. 681, 702 A.2d 290 (1997).[4]

■ An "injunction" is defined in Md. Rule 15–501(a) as "an order mandating or prohibiting a specified act." But, a permanent injunction is not "permanent" in the sense that it must last indefinitely. Rather, it "is one granted by the judgment which finally disposes of the injunction suit." 43 C.J.S. *Injunctions* § 6 (1979). The "preliminary injunction," which is at issue here, is defined in Maryland Rule 15–501(b) as "an injunction granted after opportunity for a full adversary hearing on the propriety of its issuance but before a final determination of the merits of the action." The purpose of a preliminary injunction is to preserve the status quo between the parties, pending a hearing on the merits. *See Harford County Educ. Ass'n v. Board of Educ.,* 281 Md. 574, 585, 380 A.2d 1041 (1977); *Kahl v. Consolidated Gas, Electric Light & Power Co. of Baltimore,* 189 Md. 655, 658, 57 A.2d 331 (1948); *TJB, Inc. v. Arundel Bedding Corp.,* 63 Md.App. 186, 190, 492

---

**4.** Maryland Rule BB70 referred to *ex parte,* interlocutory, and final injunctions. Injunctions are also described as "mandatory" or "affirmative," requiring or commanding a specified action, and "prohibitory" or "negative," barring or restraining a specified action. Although the nomenclature has changed, prior cases that refer to the earlier terminology remain useful to our analysis.

A.2d 365 (1985); *General Motors Corp. v. Miller Buick, Inc.,* 56 Md.App. 374, 386, 467 A.2d 1064 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984). In other words, this type of injunction is designed to maintain the "last actual, peaceable, noncontested status which preceded the pending controversy," until the parties' rights and obligations can be adjudicated at trial. *See State Dep't of Health and Mental Hygiene v. Baltimore County,* 281 Md. 548, 556 n. 9, 383 A.2d 51 (1977) (quotation omitted). The difference, then, between a preliminary injunction and an injunction turns on "whether there has been a determination on the merits of the claim. If that determination has been made, then the injunction may be final; if not, it is interlocutory." *National Collegiate Athletic Association v. Johns Hopkins University,* 301 Md. 574, 580, 483 A.2d 1272 (1984).

In order to obtain a preliminary injunction, the moving party has the burden to satisfy the following four criteria:

(1) there is a real probability that the party seeking the injunction will succeed on the merits;

(2) the injury that would be suffered if the interlocutory injunction is granted is less than the harm that would result from its refusal (the "balance of convenience test");

(3) the party seeking the injunction will suffer irreparable injury if it is not granted; and

(4) granting the injunction would be in the public interest.

*Fogle v. H & G Restaurant, Inc.,* 337 Md. 441, 455–56, 654 A.2d 449 (1995); *Department of Transportation v. Armacost,* 299 Md. 392, 404–05, 474 A.2d 191 (1984); *Teferi v. Dupont Plaza Associates,* 77 Md.App. 566, 578, 551 A.2d 477 (1989).

Nevertheless, "in litigation between governmental and private parties, or in cases in which injunctive relief directly impacts governmental interests, 'the court is not bound by the strict requirements of traditional equity as developed in private litigation.' " *Fogle,* 337 Md. at 456, 654 A.2d 449 (quoting *State Dep't of Health & Mental Hygiene,* 281 Md. at 555, 383 A.2d 51); *see Maryland Comm'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 517, 678

A.2d 55 (1996). Rather, " '[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' " *Fogle,* 337 Md. at 456, 654 A.2d 449 (quoting *Space Aero Products Co., Inc. v. R.E. Darling Co., Inc.,* 238 Md. 93, 127, 208 A.2d 74, *cert. denied,* 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965)).

It is noteworthy that E.A. § 9–339(a) expressly authorizes the Department to "bring an action for an injunction against any person who violates any provision of this subtitle or any rule, regulation, order, or permit adopted or issued by the Department...." [5] Moreover, E.A. § 9–339(c) expressly provides that the Department need not show it lacks an adequate remedy at law in order to obtain injunctive relief.

## II.

Appellants contend that the trial court abused its discretion in granting the preliminary injunction. They argue that they were not required to obtain a permit for their landfill operations, because they did not install a "refuse disposal system for public use," or operate a "solid waste acceptance facility" within the scope of E.A. § 9–204(d), E.A. § 9–501(n), and COMAR 26.04.07.01 and 26.04.07 .03. Therefore, appellants maintain that the Department did not establish the likelihood of success on the merits for purposes of obtaining the preliminary injunction.

MDE counters that the court properly concluded that a permit was required because appellants were operating a refuse disposal system that was a solid waste acceptance facility, it was operated for public use, and appellants' desire, purpose, or intention to increase the amount of grazing land on their property did not excuse their obligation to obtain the permit. Accordingly, MDE asserts that the court did not err or abuse its discretion in issuing the preliminary injunction.

---

5. Title 9 of the Environment Article concerns water, ice, and sanitary facilities. Subtitle 2 pertains to regulation by the State, and Subtitle 3 involves water pollution control.

To be sure, landfill activities are subject to extensive regulation by State law. Because resolution of this case involves an understanding and application of numerous, interrelated statutory and regulatory provisions, we begin by reviewing these provisions.

E.A. § 9–204 is central to this case. It imposes a permit requirement for a "refuse disposal system that is for public use," as well as for a refuse disposal system that is a solid waste acceptance facility under E.A. § 9–501(n), if it was installed after July 1, 1998. The statute states:

§ **9–204. Installing altering, or extending water supply systems, sewerage systems, or refuse disposal systems.**

(a) *Application of section.*—This section applies to any water supply system, sewerage system, refuse disposal system that is for public use, or any refuse disposal system that is a solid waste acceptance facility as defined in § 9–501(n) of this title if the solid waste acceptance facility is installed, altered, or extended after July 1, 1988.

\* \* \*

(d) *Permit is prerequisite.*—A person *shall* have a permit issued by the Secretary ... before the person installs, materially alters, or materially extends a water supply system, sewerage system, or refusal disposal system.

(Emphasis added).

E.A. § 9–101(c) defines a "disposal system" as a "system for disposing of wastes by surface, above surface, or underground methods."

A "refuse disposal system" is defined in E.A. § 9–201(e), as follows:

§ **9–201. Definitions.**

\* \* \*

(e) *Refuse disposal system.*—"Refuse disposal system" includes:

(1) An incinerator;

(2) A transfer station;

(3) A landfill system;

(4) A landfill;

(5) A solid waste processing facility; and

(6) Any other solid waste acceptance facility.

E.A. § 9–501(n) defines a "solid waste acceptance facility" as "any sanitary landfill, incinerator, transfer station, or plant whose primary purpose is to dispose of, treat, or process solid waste." Similarly, COMAR 26.04.07.02B(29) defines a solid waste acceptance facility in almost the same way, except that it substitutes the words "processing facility" for the word "plant."

E.A. § 9–501(*o*) defines a "solid waste disposal system" as follows:

(*o*) *Solid waste disposal system.*—(1) "Solid waste disposal system" means any publicly or privately owned system that:

(i) Provides a scheduled or systematic collection of solid waste;

(ii) Transports the solid waste to a solid waste acceptance facility; and

(iii) Treats or otherwise disposes of the solid waste at the solid waste acceptance facility.

(2) "Solid waste disposal system" includes each solid waste acceptance facility that is used in connection with the solid waste disposal system.

COMAR 26.04.07.02(30) defines a "system of refuse disposal for public use" as "the services, facilities, or properties used in connection with the ... disposal of any solid waste unless these activities are limited to waste generated by an individual, a single corporation or business, or are disposed of as authorized by a permit. . . ."

COMAR 26.04.07.03 is also relevant. It states, in part:

**.03 General Restrictions and Specifically Prohibited Acts.**

A. General Restrictions. The Department, in exercising its authority under these regulations with respect to the granting or renewal of permits or reviewing operations of a facility, shall consider all material required to be submitted under these regulations to evaluate whether any of the following factors is likely to occur or has occurred. A person may not engage in solid waste handling in a manner which will likely:

\* \* \*

(4) Cause a discharge of pollutants to waters of this State....

(5) Impair the quality of the environment; or

(6) Create other hazards to the public health, safety, or comfort as may be determined by the Approving Authority.

B. Specific Prohibited Acts.

(1) Operation of a System of Refuse Disposal for Public Use Without a Permit. A person may not:

(a) Construct or operate a system of refuse disposal for public use without first obtaining a valid permit issued under these regulations, or a permit issued under Environment Article, § 7–232 or 9–323, Annotated Code of Maryland;

(b) Cause, suffer, allow, or permit the construction or operation of an unpermitted system of refuse disposal for public use on his or her property.

(2) Operation of an Industrial Waste Acceptance Facility. A person who constructs or operates an industrial waste acceptance facility for private use is not required to obtain a permit, but shall comply with the regulations applicable to the construction, installation, and operation of solid waste acceptance facilities....

\* \* \*

(4) Operating an Open Dump. Solid waste may not be disposed of by any person in an open dump. A person may

not cause, suffer, allow, or permit open dumping on his property.

A land-clearing debris landfill is regulated by COMAR 26.04.07.11. It provides, in relevant part:

**.11 Sanitary Landfills—Land Clearing Debris Landfills—General**

* * *

B. Acceptable Wastes. A land clearing debris landfill is restricted to accepting the following waste materials from land clearing operations:

(1) Earthen material such as clays, sands, gravels, and silts;

(2) Topsoil;

(3) Tree stumps;

(4) Root mats;

(5) Brush and limbs;

(6) Logs;

(7) Vegetations; and

(8) Rock.

COMAR 26.04.07.11(C) establishes minimum operating procedures for land-clearing debris landfills. For example, it regulates grading and drainage requirements, and creates guidelines for supervision to minimize the environmental impact of such landfills.

COMAR 26.04.07 sets forth numerous requirements to obtain a permit to operate a land clearing debris landfill. These include a "map depicting the planned final grades of the site after completion of landfilling activities" (COMAR 26.04.07.12(5)); a "description of the types of solid waste" that will be accepted (COMAR 26.04.07.12(7)); the "anticipated quantities of solid waste" (COMAR 26.04.07.12(8)); the "[p]roposed means of controlling unauthorized access to the site" (COMAR 26.04.07.12(10)); operating procedures (COMAR 26.04.07.12(11)); "[p]rovisions for fire prevention and control" (COMAR 26.04.07.12(11)(e)); application of an approved cover material for exposed solid waste (COMAR 26.04.07.12(14));

and the "[m]eans of preventing public health hazards and nuisances" (COMAR 26.04.07.12(11)(f)).

## III.

It is undisputed that appellants were engaging in landfilling activity. In order to constitute a "refuse disposal system" subject to the permit requirement, appellants' operation either had to be for public use, or it had to amount to a "solid waste acceptance facility" installed after July 1988. Appellants maintain that the permit requirements did not apply to them, because they were operating as a private landfill, rather than for public use. They also claim that they were not subject to regulation as a solid waste acceptance facility, because the applicable statutory and regulatory provisions dictate that landfills are subject to the permit requirement only if their "primary purpose" was disposal or treatment of solid waste. Appellants contend, however, that their "primary purpose" was to create additional pastureland for their livestock. According to appellants, MDE failed to prove that their "primary purpose" was disposal, treatment, or processing of solid waste.

We first consider appellants' "primary purpose" claim with respect to the solid waste acceptance facility. As noted, the permit requirement of E.A. § 9–204 applies to a solid waste acceptance facility as defined by E.A. § 9–501(n). That provision defines a "solid waste acceptance facility" as "any sanitary landfill, incinerator, transfer station, or plant whose primary purpose is to dispose of, treat, or process solid waste." Appellants contend that the "primary purpose" requirement of the provision modifies not only the word "plant," but everything preceding that word, including a landfill. Therefore, in their view, a landfill is subject to E.A. § 9–204 only if its primary purpose is disposal of solid waste. Because appellants' primary purpose was "agricultural in nature and intent," in order to create more pasture, and was not disposal, treatment, or processing of solid waste, appellants maintain that they "fall outside the scope of the solid waste regulatory scheme."

Although appellants have not advanced an argument based on statutory construction, the well-honed principles of statutory construction are clearly important here. " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State*, 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995)); *see Mayor of Baltimore v. Chase*, 360 Md. 121, 128, 756 A.2d 987 (2000); *State v. Bell*, 351 Md. 709, 717, 720 A.2d 311 (1998); *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 523, 709 A.2d 142 (1998); *Mayor of Baltimore v. Cassidy*, 338 Md. 88, 93, 656 A.2d 757 (1995); *In re Jason Allen D.*, 127 Md.App. 456, 475, 733 A.2d 351 (1999); *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 592, 723 A.2d 502, *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999). To determine legislative intent, we look primarily to the language of the statute itself. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455 (1997); *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 570, 709 A.2d 749 (1998); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951 (1996); *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 306, 631 A.2d 77 (1993). In doing so, we consider "the language of an enactment" and give "that language its natural and ordinary meaning." *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994); *see Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998); *Chesapeake and Potomac Tel. Co. v. Director of Fin.*, 343 Md. 567, 578, 683 A.2d 512 (1996); *Carroll County Ethics Comm'n v. Lennon*, 119 Md.App. 49, 67, 703 A.2d 1338 (1998). Generally, if the statute's language is plain and its meaning is clear, we need not look beyond the words of the statute itself. *Read v. Supervisor of Assessments*, 354 Md. 383, 393, 731 A.2d 868 (1999); *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628 (1987).

A statute must be considered as a whole; "all sections of the Act must be read together, in conjunction with one another, to discern the true intent of the legislature." *Philip Electronics North America v. Wright*, 348 Md. 209, 216, 703 A.2d 150 (1997). Moreover, in deciding the plain meaning

of a statutory term, we may consult the dictionary. *State Dep't of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 14, 702 A.2d 690 (1997); *Rouse–Fairwood Ltd. P'ship v. Supervisor of Assessments,* 120 Md.App. 667, 687, 708 A.2d 19 (1998).

Further, when analyzing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994); *see State v. Thompson,* 332 Md. 1, 8, 629 A.2d 731 (1993) (explaining that courts must reach a statutory interpretation compatible with common sense). As the Court said in *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993), "[g]iving the words their ordinary and common meaning 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence,' normally will result in the discovery of the Legislature's intent." (Internal citations omitted).

In construing a statute, what the Court recently said in *Martin v. Beverage Capital Corp.,* 353 Md. 388, 726 A.2d 728 (1999), is pertinent here. "In determining legislative intent, we must never lose sight of the overriding purpose and goal of the statute." *Id.* at 399, 726 A.2d 728. This is because "the search for legislative intent is most accurately characterized 'as an effort to "seek to discern some general purpose, aim, or policy reflected in the statute." ' " *Id.* (quoting *Kaczorowski,* 309 Md. at 513, 525 A.2d 628, in turn quoting Melvin J. Sykes, *A Modest Proposal for a Change in Maryland's Statutes Quo,* 43 Md.L.Rev. 647, 653 (1984)).

We agree with MDE that appellants' construction of E.A. § 9–501(n) [6] creates an "illogical result" that contravenes the Legislature's purpose and intent. Applying the many principles of statutory construction, we believe that the qualifying

---

**6.** For convenience, we restate the definition of a "solid waste acceptance facility" in E.A. § 9–501(n):

"... any sanitary landfill, incinerator, transfer station, or plant whose primary purpose is to dispose of, treat, or process solid waste."

phrase "primary purpose" modifies only the word "plant," and not the other specific kinds of facilities that precede that word "plant." We find support for our view in *Sullivan v. Dixon*, 280 Md. 444, 373 A.2d 1245 (1977).

In *Sullivan*, the Court construed Md.Code (1975, 1976 Supp.), § 5–104(b) of the Corp. & Assn's Article ("C.A."). It stated, in relevant part:

**§ 5–104. Corporation not to engage in other business; investments; ownership of property.**

(b) *Corporate investment and ownership of property.*— Notwithstanding any other provision of law, a professional corporation may invest its funds in real estate, mortgages, stocks, bonds, or any other type of investment, and may own real or personal property *necessary for the performance of a professional service.*

(Emphasis added). The appellant contended that the qualifying phrase, "necessary for the performance of a professional service," modified the entire sentence. The appellant hoped to prove that the appellee's acquisition of a mortgage and its subsequent sale was illegal, because it was not necessary for the performance of a professional service, i.e. appellee's business. Based on principles of statutory construction, however, the Court determined that the qualifying phrase only modified the "clause dealing with ownership of property," and was not intended "to restrict the power of professional corporations to invest their funds." *Id.* at 451, 373 A.2d 1245. In reaching that conclusion, the Court recognized that the comma after the word "investment" separated the preceding words from the qualifying phrase. The Court said that "a qualifying clause . . . is confined to the immediately preceding words or phrase-particularly in the absence of a comma before the qualifying clause . . ." *Id.* Therefore, the Court concluded that the appellee did not violate the statute. *Id.; See Beales v. State*, 329 Md. 263, 271, 619 A.2d 105 (1993)(stating that the absence of a comma before the word "or" suggests that "the language flows most naturally when read without a pause" and the qualifying clause "modifies the entire component that precedes it.").

■ Here, we observe that there is a comma immediately after the words "transfer station," followed by the word "or plant." The word "plant," however, is not followed by a comma. Thus, the comma after the words "transfer station" sets apart all the words preceding the comma from the subsequent qualifying language that appears immediately after the word "plant." The absence of a comma after "plant" is also noteworthy, because the lack of a comma serves to link "plant" alone to the qualifying clause that follows the word "plant." Thus, we believe that the qualifying phrase in issue ("whose primary purpose") only applies to the word "plant." It follows that a landfill may constitute a solid waste acceptance facility without regard to its primary purpose. In other words, it need not have the purpose of disposal, treatment, or processing of solid waste in order to be subject to the permit requirement.

■ Our construction of the statute comports with the principles of statutory construction outlined above, which do not require us to abandon our common sense. *See Webster v. State,* 359 Md. 465, 480, 754 A.2d 1004 (2000); *Lewis v. State,* 348 Md. 648, 654, 705 A.2d 1128 (1998)(stating that statutory interpretation "must be reasonable and consonant with logic and common sense."). Moreover, we must avoid " 'construing the statute in a manner that leads to an illogical or untenable outcome.' " *Webster,* 359 Md. at 480, 754 A.2d 1004 (quoting *Lewis,* 348 Md. at 654, 705 A.2d 1128 (citations omitted)). Our construction is also consonant with the overall statutory purpose, and consistent with the statute as a whole. Were we to adopt appellants' statutory interpretation, applicability of the regulatory requirements would turn on the underlying motivation of the property owner or facility operator. As long as a person or entity had a "primary purpose" other than the disposal, treatment, or processing of solid waste, the Legislature's desire to minimize environmental degradation and to protect public health, safety, and welfare could be readily subverted. Surely, there is no logic or rational basis to exempt landfills from regulation on the basis of the owner's subjective motivation.

Our view is strengthened when we consider that, in contrast to the other terms in § 9–501(n), such as sanitary landfill, incinerator, and transfer station, the word "plant" is the only word in that statutory provision without an accepted, technical meaning within the context of solid waste. Unlike the other terms, the word "plant," without more, could refer to many kinds of facilities. Moreover, the other terms are specifically defined in the regulations. *See* COMAR 26.04.07.02B(11), (27), (32). Indeed in COMAR's definition of a solid waste acceptance facility the phrase "processing facility" is substituted for the word "plant." *See* COMAR 26.04.07.02B(29). Accordingly, we believe that the Legislature limited the applicability of the permit requirement to those plants whose primary purpose is to "dispose of, treat, or process solid waste." A landfill, then, need not have that purpose to fall within the permit requirement.

Appellants rely on *Howard County v. Carroll,* 71 Md.App. 635, 526 A.2d 996 (1987), to support their argument that the subjective motivation of an owner excepts him from the permitting requirements. In that case, a farmer conducting land clearing operations obtained a permit from the Office of Environmental Programs, authorizing a landfill " 'consisting only of tree stumps, brush and clean earth.' " *Id.* at 640, 526 A.2d 996. Nevertheless, he was cited by the Sediment Control Division of the Howard County Department of Public works for illegally grading his land without a permit and an approved sediment control plan. The farmer was not penalized for his actions because his activities were found to constitute "agricultural land management practices," exempt under the Howard County Code. The case does not advance appellants' argument because, unlike in this case, the farmer had obtained a State landfill permit. Instead, he had not obtained a local grading permit.

*Jett v. State,* 77 Md.App. 503, 551 A.2d 139 (1989), is also noteworthy. There, appellant received stumps and land-clearing debris from hauling contractors to fill low-lying areas of his Christmas tree farm to create level ground to plant more trees. The trial court found that the appellant's operations

fell within a then existing regulatory exemption to the permitting requirements, covering "agricultural waste." On appeal, we specifically noted that "[r]egulations recently adopted by [MDE] have excluded disposal activities such as those in the instant case from the exception to the permit requirements by amending the definition of agricultural waste. COMAR 26.04.07.02B(1)." *Jett,* 77 Md.App. at 506 n. 3, 551 A.2d 139.

We also must consider appellants' "public use" argument with respect to refuse disposal systems. Appellants rely on E.A. § 9–204(a) as well as legislative history to argue that the permit requirement does not apply to their landfill operation. As MDE points out, the "private use" defense is applicable to solid waste acceptance facilities created prior to July 1, 1988, but does not apply to solid waste acceptance facilities installed after that date.

Beginning in 1914, the permitting authority of the Board of Health, and its successor, the Department of Health and Mental Hygiene, was limited to regulation of refuse disposal systems operated for public use. *See* Md.Ann.Code, Art. 43, § 394 (1971 & 1979 Supp.). When these functions were transferred to MDE, E.A. § 9–204 retained the limitation by providing that the permitting statute applied only to refuse disposal systems that were for public use. 1987 Md. Laws ch. 612. Thus, prior to 1988, refuse disposal systems for "private use," that is, those facilities limited to waste generated by an individual or a single business, were exempt from the permit requirement under E.A. § 9–204 and COMAR 26.04.07.03B. In 1988, however, the Legislature amended § 9–204(a). E.A. § 9–204(a) and 9–204(d) now require permits for "*any* refuse disposal system that is a solid waste acceptance facility as defined in E.A. § 9–501(n) . . . installed, altered, or extended after July 1, 1988." 1988 Md. Laws ch. 412. (Emphasis added).

MDE explains that the regulations have not kept pace with the legislative changes. Although the statute was amended in 1988, the regulations have not been revised since then to conform to the statutory changes. But, the statutory amend-

ment "overrides" the earlier regulatory distinction between private and public use refuse disposal systems. Thus, the regulations, which were intended to exempt individuals and businesses processing waste generated from their own business or personal activity, are null and void to the extent that they seem to apply to a solid waste acceptance facility installed, altered, or extended after July 1, 1988. *See Lussier v. Maryland Racing Comm'n,* 343 Md. 681, 688, 684 A.2d 804 (1996)(stating that regulations are valid under statute if they do not contradict statutory purpose). Although the permit exemption applies to solid waste acceptance facilities that were installed prior to July 1, 1988, appellants do not contend that the grandfather provision applies to their facility.

Even if the difference between private and public landfills were still in effect, however, appellants' position lacks merit, because they were operating a refuse disposal system for public use. In their brief, appellants concede that the land-clearing debris was obtained from more than one entity. Moreover, the trial court concluded that appellants' refuse disposal system was for public use, and that finding is not clearly erroneous.

Appellants claim that MDE's definition of "public use," to mean disposal by more than one person, "is a strained and unnatural interpretation of the meaning of 'public' as open or accessible to the community." Instead, appellants urge us to look to case law that has shaped the meaning of "public use," noting that the Environment Article does not define the term "public use." *See Green v. High Ridge Ass'n,* 346 Md. 65, 73, 695 A.2d 125 (1997); *Mayor of Baltimore v. State Dep't of Health & Mental Hygiene,* 38 Md.App. 570, 381 A.2d 1188 (1978); *Youngstown Cartage Co. v. North Point Peninsula Cmty. Co-Ordinating Council,* 24 Md.App. 624, 332 A.2d 718 (1975). They observe that "public use" has largely been defined in two ways: 1) "public use requires proof that the public has the right to use or enjoy the regulated property;" or 2) "public use exists where the use and enjoyment of the regulated property is for the public benefit."

Appellants aver that their property is not for public use, because the public has no access to the property. Appellants also note that the property is "gated, locked, and inaccessible," and only select entities have access to the property for the purpose of dumping trees, stumps, and shrubs. Additionally, appellants argue that there is no conferred public benefit because they are filling an area of a private farm for a private purpose, and thus the landfill is wholly for private purposes, to increase the amount of pastureland on the farm. Thus, appellants maintain that they do not operate a refuse disposal system "for public use," or a refuse disposal system that is a private "solid waste acceptance facility." Therefore, they contend that the trial court erred in holding that they improperly operated an unlicensed landfill or open dump for public use.

A "system of refuse disposal for public use" is expressly defined in COMAR 26.04.07.02B(30) as "the services, facilities, or properties used in connection with the intermediate or final disposal of any solid waste *unless* these activities are limited to waste generated by an individual, a single corporation or business, or are disposed of as authorized by a permit issued by [MDE] . . ." (emphasis added). The common sense meaning of this provision indicates that, in order to fall within the "private use" exemption, a landfill must not accept solid waste from other sources.

Appellants' activities clearly fell within the provisions of a refuse disposal system for public use under E.A. § 9–204(a) and as defined in COMAR 26.04.07.02B(30). Appellants never denied that they were engaged in landfilling. Furthermore, the evidence showed that trees, stumps, and earth were brought to the site from several businesses. Accordingly, appellants' conduct was not limited to "waste generated by an individual, a single corporation or business," nor was it "disposed of as authorized by a permit issued by [MDE]." Therefore, the court correctly determined that appellants were operating a refuse disposal system for public use.

As we noted, appellants also argue that their conduct did not amount to a public use because the activity did not confer a "public benefit" or serve a public purpose. Appellants ignore the well recognized principle that gives weight to an agency's construction of a statute that it administers. *See Westinghouse Electric Corp. v. Callahan,* 105 Md.App. 25, 35, 658 A.2d 1112 (1995). The permit requirements do not depend on the intended use of the filled land. Even if appellants' conduct did not fulfill a public purpose, we agree with MDE that whether appellants "open their doors to every member of the general public ... in no way affects [their] status as a refuse disposal system for public use subject to the permit requirement."

## IV.

As we discussed earlier, four factors must be satisfied in order to obtain a preliminary injunction. They are: (1) the real probability that the petitioning party will succeed on the merits; (2) the "balance of convenience," i.e., whether the non-petitioning party would suffer greater injury if the injunction were granted than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury in the absence of injunctive relief; and (4) the public interest. *Fogle v. H & G Restaurant, Inc., supra,* 337 Md. at 455–56, 654 A.2d 449; *Teferi v. Dupont Plaza Assoc., supra,* 77 Md.App. at 578, 551 A.2d 477.

Appellants argue that the trial court abused its discretion in its application of the equitable factors. They assert that "the Department should not be able to obtain a cease and desist order against a farmer's agricultural operations based on its speculation that the filling may result in runoff or may someday catch on fire." They also aver that the trial court erred in finding the prospect of irreparable injury unless it issued the preliminary injunction.

Conversely, MDE argues that the potential harm suffered by the public and the environment due to the appellants' landfilling activities necessitated the imposition of the prelimi-

nary injunction. Citing *Joy v. Anne Arundel County*, 52 Md.App. 653, 660, 451 A.2d 1237 (1982), and *Thomas v. Department of Health and Mental Hygiene*, 62 Md.App. 166, 175, 488 A.2d 983 (1985), the Department claims that it merely had to show that the conduct sought to be enjoined violated or was about to violate a law or regulation designed to protect the public health and welfare.

The court recognized the four criteria applicable to a preliminary injunction, stating, in part:

In applying these criteria to the case *sub judice*, the Court determines, based on the evidence brought forth at the hearing, that there is a high likelihood that the Plaintiff will succeed at the conclusion of this case. The fact that the Defendant is operating an open dump, which can also be characterized as an unlicensed refuse disposal system, has been clearly demonstrated by the evidence. The Court concludes that the greater injury would not be done to the Defendant by granting the injunction than would be sustained to the Plaintiff in its refusal. The Defendant, if the preliminary injunction is granted, must simply refrain from violating the relevant provisions of the Maryland annotated Code and regulations passed in conformance thereto. This is no injury to the Defendant. The Plaintiff, however, if the injunction is denied, will suffer an ongoing violation with increased risks of fire. The Defendant has suggested that there is no irreparable harm that the Plaintiff will suffer if the injunction is denied. The Court rejects this conclusion on two grounds. Initially, the Court accepts the testimony of the Plaintiff's witnesses that there is an increased risk of fire when the regulations pertaining to land clearing debris landfills are not followed. However, even if the Court was not persuaded that the landfill in question has resulted in an increased fire hazzard, the Court finds that granting the injunction would still be appropriate. The Maryland Court of Special Appals stated in the case of *Joy v. Anne Arundel County*, 52 Md.App. 653, 451 A.2d 1237 (1982) that in actions brought by the government to enforce zoning violations, the showing of irreparable harm requirement only

applies to private parties as plaintiffs. The Court explained that the political subdivision may be considered to be acting on behalf of all property owners within the subdivision to enforce their right to require conformity with the ordinance as the quid pro quo for their own submission to the restrictions imposed on their property. The Court determines that the same rational applies to landfill regulations as apply to zoning regulations as both are exercises in government restrictions over use of private property.

The final consideration is the public good or welfare. The Court finds that enforcing the pertinent permit requirements benefit the public welfare by protecting against increased risk of fire presented by the landfill that does not meet regulations. The Court further finds that to ignore or exempt the Defendant from controlling regulations harms the public by fostering disrespect for the law and would only serve to tempt others to similarly ignore the lawfully imposed restrictions on land clearing debris landfills and refuse disposal systems.

Our decision in *Joy*, 52 Md.App. 653, 451 A.2d 1237, referred to by the trial court, is instructive. There, appellant owned a business that operated as "a junkyard, a resource reclamation facility, and a hazardous waste facility." *Id.* at 655, 451 A.2d 1237. The County complained several times that appellant's activities violated zoning regulations, and eventually sued appellant for operating a business outside the permitted uses in a W–2 District. Moreover, appellant had failed to obtain a zoning certificate of use as required by the County code. Eventually, the County brought suit against appellant in the circuit court seeking injunctive relief. That court issued an *ex parte* injunction after documents indicated that the State Water Resources Administration had ordered appellant to cease and desist from the storage of hazardous wastes. The court reasoned that "storage of hazardous wastes without State or county approval constituted immediate, substantial, and possible irreparable injury to the citizens of Anne Arrundel County". *Id.* at 656–57, 451 A.2d 1237. At the close of the ex parte injunction hearing, the County moved

for summary judgment, which was denied because of a factual dispute as to what was occurring on the property, and whether hazardous wastes were actually present. The court, however, granted an interlocutory injunction. Subsequently, the court granted summary judgment and a permanent injunction. On appeal, we said that although

> a zoning violation may not be enjoined absent a showing of irreparable injury, this rule applies only when private parties are the plaintiffs ... When a political subdivision seeks injunctive relief against a zoning violation, it need not prove damages or irreparable injury to it. That is because the political subdivision "may be considered to be acting on behalf of all property owners within [it] to enforce their right to require conformity with the ordinance as the quid pro quo for their own submissions to the restrictions imposed on their property."

*Joy,* 52 Md.App. at 660, 451 A.2d 1237 (citations omitted). Thus, we determined that, given the undisputed material fact that the appellant did not comply with the zoning regulations and obtain a certificate of use, the circuit court properly granted summary judgment.

A review of the testimony adduced below demonstrates that the court properly found a cognizable threat to human health and the environment stemming from appellants' failure to adhere to the applicable regulations. It is undisputed that there were several "hot pockets" located in Area A of appellants' property. Heather Nelson, a MDE registered sanitarian and a regional solid waste inspector for MDE, testified as follows:

> [T]here were several areas where there were—I would call them hot pockets where high heat was venting from underneath the surface of—you know, from the buried land clearing debris. There were pockets around trees and ... There were pockets where there were smaller holes where you could feel venting heat.

As we observed, the court also observed the hot pockets during its on-site inspection. The court specifically inquired

about the origins of cloud like substances emanating from the area around standing trees within the landfill.

MDE's expert witness, Dexter, testified as an expert in solid waste management, including pollution control at solid waste facilities. He was of the view that the presence of hot pockets posed a threat of spontaneous combustion, stating:

> ... I noticed another phenomenon. I believe Ms. Nelson testified about the vapor coming off. It was a warm moist air. I estimated certainly over a hundred degrees. I think considerably warmer than that. Not hot enough to burn, but enough to give you a good sauna if you were to put a tent over it, for example.
>
> This is direct and real evidence of biological decomposition within the ground. The wood that makes up the natural waste and leaves and so on is decomposing at a fairly rapid rate. The finest stuff is fueling that.
>
> The significance of this from the environment is two-fold. First of all, there is gases released with that. Secondly, *the heat there is a source—a potential source of spontaneous combustion,* which we have seen in en[n]umerable cases.

(Emphasis added).

Additionally, Robert Hartlove, the Regional Forest Fire Protection Supervisor for the Department of Natural Resources, testified as an expert in the field of fire prevention about deficiencies in the fire control measures at the property. The following colloquy is relevant:

> [MDE'S ATTORNEY]: What is your opinion as to whether or not there are adequate fire prevention or control measures in Area A?
>
> [HARTLOVE]: There are not. All I saw—observed was access by the local fire department should they have to enter the scene.
>
> [MDE'S ATTORNEY]: And with respect to Area B, what were your observations with respect to Area B?
>
> [HARTLOVE]: Area B, from what I observed, the bulk of the material had been covered. There was some that was

still susceptible to an ignition source. There was—I recall one tree sticking up out of the pile. That's a potential lightning strike area. But the majority of it had been covered up. Not as—not as susceptible to an ignition.

[MDE'S ATTORNEY]: Going back to Area A, if a fire happens in Area A how would they have to proceed to put the fire out.

[HARTLOVE]: If the fire were discovered within minutes and there were some sort of a suppression unit there, i.e. a portable tank and pump type unit with several hundred gallons of water and somebody was there to extinguish it, if it involved waiting for the local fire department, I believe that would be from—I forgot which one was across Route 4. By the time the fire department got there the extension into the fuels would make it inextinguishable without bringing in probably two clamshell cranes and physically pulling the pile apart piece by piece, dropping it on the ground and extinguishing it.

The amount of fuel that was piled on top of the covered are—they had covered some of that area. But the amount of fuel that was on there would prevent fire apparatus from even getting close enough to the scene to do any good in suppression. They'd have to use ladder pipes on it and I don't see any way that they could flow enough water to do that.

\* \* \*

[MDE'S ATTORNEY]: Is there a danger of a subterranean fire at this site.

[HARTLOVE]: Yes. Yes. The whole area of the pile, I believe it's to the south that opens the ravine, is wide open and that actually is the worse case scenario if fire were to get in to the bottom of the pile and work it's way in subterranean. Again, you wouldn't be able to put it out. Not without physically removing the pile.

Hartlove also testified about the significance of the drought Maryland was then experiencing, and the potential fire threat from it. The following colloquy is relevant:

[MDE'S ATTORNEY]: Do you have an opinion ... that there's not adequate fire prevention measures at Area A.

[HARTLOVE]: That's correct

[MDE'S ATTORNEY]: And if the site were to continue without these adequate fire prevention measures, do you believe that presents a safety concern?

[HARTLOVE]: I believe that human activity around the site could lead to an ignition in that area, if that helps you.

[MDE'S ATTORNEY]: Did you notice—you mentioned the trees that are in the site?

[HARTLOVE]: Yes.

[MDE'S ATTORNEY]: Do those present a lightning risk?

[HARTLOVE]: They do. Usually in this part of the country we have lightning strikes they're accompanied by rainfall, copious mounts of rainfall, and they usually don't present a problem.

But within the last three years because of drought conditions, we have had a number of what we call dry lightning storms that pass though an area, strike usually popular or gum type trees are good conductors, and the fires can smolder for several days even if they are accompanied by brief shower and they can result in fires.

We've had three lightning strike fires within the last month.

[MDE'S ATTORNEY]: And does the condition at Area A present a threat in that regard?

[HARTLOVE]: In my opinion it does.

Overall, Hartlove felt that there were several measures needed to improve the safety of the site. He recommended the following:

First, would be to provide access around the site if it were possible, which would take bulldozing a road around the site. I don't know if we really could because that may infringe on a critical area. I don't know.

Secondly would be to remove the standing trees that have been backfilled around[ ] standing poplars. They are conducive to lightning strikes, especially pop[ ]lar. Again those trees, if they're in a critical area, that would not be possible.

Most importantly would be to cover the fuel that's there to prevent an ignition source from getting to it.

Additionally, appellant's own expert, Cattington, admitted that certain conditions at the landfill presented an increased risk of fire. He said:

[MDE'S ATTORNEY]: If there were trees in the landfill that act as vent holes, and in those trees-in those vent holes there was hot air coming out, if someone has testified to that effect, would you agree that that's probably an indication of decomposition?

[CATTINGTON]: Not necessarily, I wouldn't That could be air currents or anything. I couldn't say that that was decomposition because you feel a difference in temperature change.

[MDE'S ATTORNEY]: If there is decomposition at the site, would you agree that that would increase the risk of a danger of fire?

[CATTINGTON]: If there is decomposition?

[MDE'S ATTORNEY]: Yes?

[CATTINGTON]: Yes, If there's decomposition it would increase the risk of fire.

Additionally, Cattington testified that he was concerned about one of the leading edges at Site A, which was uncovered and exposed to the open air. He agreed that the open leading edge could act as a vent hole, contributing to the possibility of potential combustibles. In terms of fire prevention, Cattington opined that the land-cleared wood should be covered on a daily basis.

There was also evidence showing that the landfill polluted the ground and water. Dexter testified as follows:

THE COURT:—does this land pollute the ground or water in Calvert County? Do you have an opinion? You may? You may not? You may need more data. I don't know.

[MR. DEXTER]: In my opinion with what I have observed at the site during my site visit this month or rather, excuse me, August 26th, 1999, there were-except for the presence of the silt fence, there were no barriers to prevent the discharge of sediment to the stream that's located just downhill from it.

Further, although I do not have certain-proof certain, I saw evidence of wastes in the landfill which have the potential to release pollutants in the environment in which they existed should they continue to remain there.

\* \* \*

[MR. DEXTER]: ... First of all, the natural wood waste itself. It's an organic material. I saw during my inspection clear evidence that the buried material is decomposing in the ground. It's a natural process just as you would expect an organic material when buried and exposed to the soil bacteria and so on you would expect, like any reasonable person would expect, some decay to occur.

A landfill is to this extent an unnatural creation. We've artificially placed lot of material, which except in extremely unusual circumstances, would not come together in such large quantities in nature. A flood or a volcano might do it, but not under unusual circumstances. A tree falling in the forest for example, doesn't do it.

In this case you have a wide variety of particle sizes in the natural wood. Everything from very large tree trunks I observed to even green leaves that had come in sometime in the recent past. Dead leaves, vines, sticks, twigs, all the way up.

\* \* \*

... It is either the decomposition of the natural wood, which releases organic chemicals, you know. It's not-it's not

hazardous waste, but it's enough that any liquid draining through it through rain and snow melt and things like that will extract any sizeable compounds. I mean, the very way that you make wood alcohol is by putting wood waste and water to generate other things. The alcohol is a natural byproduct of naturally occurring decomposition by bacteria.

So there's a sizeable product of simply the wood waste naturally decomposing in the ground and I saw evidence of that decomposition was occurring. Now the impact [of that], again, is not hazardous waste. It's decreasing the oxygen in the receiving stream, which is in near proximity based on maps.

Given the evidence regarding pollution and the threat of fire, the court did not err or abuse its discretion in issuing the preliminary injunction. Based on our review of the record, we believe that the trial court thoroughly considered the four criteria, weighed the evidence, and properly concluded that a preliminary injunction was warranted.

The court was " 'not bound by the strict requirements of traditional equity as developed in private litigation.' " *Fogle,* 337 Md. at 456, 654 A.2d 449 (quoting *State Dept. of Health & Mental Hygiene,* 281 Md. at 555, 383 A.2d 51); *see Downey Communications,* 110 Md.App. at 517, 678 A.2d 55. Rather, the court was entitled to " 'give and withhold relief in furtherance of the public interest. . . ." *Fogle,* 337 Md. at 456, 654 A.2d 449 (quoting *Space Aero Prods. Co., Inc. v. R.E. Darling Co., supra,* 238 Md. at 128, 208 A.2d 74). The permitting requirements ensure compliance with the minimum standards for the public health and safety.

Moreover, a showing of irreparable injury does not need to "be beyond all possibility of compensation in damages, nor need it be very great." *Maryland–National Capital Park and Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 616, 386 A.2d 1216 (1978) (citing *Hart v. Wagner,* 184 Md. 40, 47–48, 40 A.2d 47 (1944)). When "monetary damages are difficult to ascertain or otherwise inadequate," this may give rise to a finding of irreparable injury. *Maryland–National*

*Capital Park and Planning Comm'n,* 282 Md. at 616, 386 A.2d 1216; *Danielson v. Local 275, Laborers Union,* 479 F.2d 1033, 1037 (2d Cir.1973). Here, it would be difficult to affix monetary damages caused to the environment by the actions of appellants, especially were a fire to break out on the property.

**JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**